UNITED STATES v. RAND and others.[1]

*(District Court, E. D. Pennsylvania.   May 24, 1883.)*

NEUTRALITY—VIOLATION OF—CONSTRUCTION OF SECTION 5286, REV. ST.
    The captain and mate of a United States vessel, who, knowing the character of their cargo and its intended purpose, transported arms from a port within the United States to a foreign port, together with men and stores, to be used in a military expedition against a people at peace with the United States, are guilty of violating section 5286 of the Revised Statutes.

This was an indictment against Augustus C. Rand and Thomas Pender, the captain and mate of the steamer Tropic, for the violation of section 5286 of the Revised Statutes, relating to military expeditions against people at peace with the United States.

The facts are set forth in the charge of the court.

*H. P. Brown*, Asst. Dist. Atty., and *J. K. Valentine*, Dist. Atty., for the United States.

*Alfred & Arthur Moore*, for defendants.

BUTLER, J., *(charging jury.)*   On the fifteenth day of March last the ship Tropic sailed from this port in command of the defendants—the one as captain and the other first mate—with a cargo of arms and military stores, consisting of rifles, muskets, cannon, cutlasses, ammunition, and uniforms.   She proceeded direct to Inagua, where she arrived on the twenty-second of the same month, and during the night and the next day, took on board a large number of men, who were soon after put into uniforms, drilled, and prepared for active military service.   She then proceeded to Miragoane, Hayti, where the men were disembarked, and an attack made upon the representatives of the Haytian government, there in command, and the town captured. During the attack the vessel rode outside the harbor, and immediately after ran in and landed her stores.   On the return of the ship to this port the defendants were arrested, and are now on trial for an alleged violation of a statute of the United States, which reads as follows:

"Every person who, within the territory or jurisdiction of the United States, begins or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, colony, district, or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor."

1 Reported by Albert B. Guilbert, Esq., of the Philadelphia bar.

That the attack upon and capture of Miragoane was the result of a *military expedition,* is clear.   Was it begun or set on foot within the territory of the United States, to be carried on from thence, or the means here provided for such an expedition?   As we have seen, the arms, military stores, and means for the transportation of them, and of the men subsequently taken on board, were here provided and started out.   That the men were not taken on board until the vessel reached Inagua, is not, in the judgment of the court, material.   The expedition, as it left this port, viewed in the light of subsequent events—(the shipping of the men at Inagua, and the attack upon Miragoane)—was, in the judgment of the court, a *military enterprise,* within the terms and spirit of the statute,—a military enterprise *begun or set on foot within the territory* of the United States, *to be carried on from thence.*   To enter upon a critical, abstract definition of the statute, here, would serve no useful purpose.   The signification of its terms, in the aspect now involved, is sufficiently defined by what has been said.   I repeat, the expedition which sailed from this port, as described by all the testimony in the cause, was a *military expedition,* within the scope of the statute.   The language—"to be carried on from thence"—is employed in the sense of *carrying out,* or *forward,* from thence.

The only controverted question of fact for your determination, therefore, is, were these defendants, or was either of them, connected with it, with knowledge of the circumstances, and with design to promote it?   That they commanded the vessel, took out the arms, stores, and men, and landed them at the place of attack, is undisputed.   Their defense is that they were ignorant of the enterprise; that they did not know what the cargo consisted of; that when the men were shipped they were supposed to be passengers; and that all the defendants subsequently did was the result of coercion.   If this is true, it is a complete defense.   Is it true?   The defendants appeared before you as witnesses, and swore to it, circumstantially and in detail, as you heard.   The engineer and the second mate, who bears the same name as one of the defendants, were called to prove the alleged coercion.   You heard their testimony,—the statement that the captain appeared anxious to get away without landing the stores, etc.,—and must judge what weight this testimony is entitled to.   Other witnesses testify that the captain exhibited alarm towards the close of his voyage, as the expedition neared its destination, and that he then declared his ignorance of its purpose at starting.   What weight should be attached to these declarations, and to this exhibition of alarm, you must judge.   Whether such alarm is inconsistent with a belief that he was aware of the character of the enterprise from the start, you will consider.   The instances are probably rare in which men carry out to the end hazardous enterprises involving property and life—even where most deliberately entered upon—without temporary moments of hesitation and alarm.   In the light

of surrounding circumstances, is the defense, (that the defendants were ignorant of the character of the expedition, and were not intentionally connected with it at the time of starting out,) probable and credible? As you have been informed, the clearing of the ship here was irregular. The cargo was put on board in the manner stated by the witnesses, and the vessel sailed without making the usual entry at the custom-house. The captain appears to be a man of experience and intelligence. His failure of duty in this respect is, therefore, somewhat remarkable, if he was ignorant of the character of his cargo. You will judge whether his explanation (if what he says may be called an explanation) is satisfactory. Notwithstanding the cargo was destined for Port Antonio, he went to Inagua, where he arrived about 10 o'clock, and remained until the next morning, taking on board during the night a large number of men. You heard his explanation of this: that he was directed, on leaving this port, to touch at Inagua for orders, and that in taking the men on board he was obeying the orders there received. Is this explanation probable? The ship was not fitted out for the transportation of passengers, and, as he tells you, he knew that it was unlawful to carry them, in its condition. After starting out from Inagua, and returning with the steamer Alva, which he met, and being informed from the British man-of-war, lying near by, that he would not be permitted to take the additional large number of passengers which he desired to carry to Miragoane, he ran out to sea some 15 miles, and lay there in the night, with his lights down, awaiting the arrival of these passengers, in pursuance of an arrangement that they should be brought to him at that place. He tells you that his lights were down because he was coerced into removing them; but in view of the fact that he was seeking to carry the men away against the orders of the man-of-war, and was manifestly lying where he was with a design to take them without discovery, you will judge whether the removal of his lights was not consistent with, and in furtherance of, this purpose; and whether, therefore, his statement that he was coerced into removing them is worthy of belief. You now find him at Inagua, with his cargo for Port Antonio, his vessel crowded with men, voluntarily taken on board,—a vessel unsuited to the carriage of passengers, and on which it was unlawful to carry them. He says he did not know why he was forbidden to carry the men to Hayti. You will judge, however, whether he did not understand that it was because the public peace there would be jeopardized by his doing so, and whether, therefore, he did not understand the character and purpose of these men when he voluntarily took them on board. Thence he started to Miragoane. He tells you that he now, or soon after, discovered the character of the expedition, and all that he subsequently did was the result of coercion. The men and stores were taken to Miragoane, and there put ashore in the manner and under the circumstances described by the witnesses. No fare or freight was paid or demanded. Although the

American consul at Miragoane was seen and communicated with, no complaint appears to have been made, nor redress sought, for the alleged outrage upon the vessel; nor was any complaint made elsewhere subsequently; nor was the transaction reported to the consignors of the cargo, or the owners of the vessel, prior to the arrest. In the light of these circumstances, and of all the testimony bearing upon the question, do you believe that the defendants did not know the character of their cargo, and were not aware of the intended attack on Hayti, on leaving this port? If you do so believe, you must acquit them; and it will, no doubt, in such case be a pleasure to do so. On the other hand, if you believe they were aware of the character of the cargo, and started out for the purpose of carrying it, and the men subsequently taken on board, to Hayti, for the purpose of making the attack afterwards made there, you should convict them. The defendants are entitled to the benefit of any reasonable doubt you may have on the subject. The case is an important one, and deserves your most serious consideration. The statute involved is founded in a wise and beneficent purpose—the discharge of an important national duty towards other friendly powers; and its violation involves the national honor as well as the public peace.

You will bear in mind that you may convict one of the defendants and acquit the other, or convict or acquit both, as your judgments dictate.