UNITED STATES *v.* TRUMBULL *et al.*

*(District Court, S. D. California.* November 3, 1891.)

1. NEUTRALITY LAWS—FURNISHING ARMS TO FOREIGN INSURGENT—"FITTING OUT" VESSEL.

Rev. St. U. S. § 5283, prescribing a punishment for any person who is in any way concerned in "furnishing, fitting out, or arming" any vessel with intent that she shall be employed in the service of any foreign state or people, to cruise or commit hostilities against any foreign state or people with whom the United States are at peace, does not cover the act of purchasing arms and munitions of war, and putting them on board a vessel sent to receive them, with intent that they shall be carried to a party of insurgents in a foreign country, to be used in carrying on war against the government thereof, but which are not designed to constitute any part of the fittings or furnishings of the vessel herself.

2. SAME—SETTING ON FOOT EXPEDITION—WHAT CONSTITUTES.

When a party of insurgents, already organized and carrying on war against the government of a foreign country, send a vessel to procure arms and ammunition in the United States, the act of purchasing such arms and ammunition, and placing them on board the vessel, is not within the scope of Rev. St. U. S. § 5286, prescribing a punishment for every person who, within the limits or jurisdiction of the United States, begins or sets on foot, or provides or prepares the means for, any military expedition or enterprise, "to be carried on from thence."

At Law. Indictment of Trumbull and Burt for violation of neutrality laws.

*W. Cole,* U. S. Atty., and *Alexander Campbell* and *A. W. Hutton,* Special Asst. U. S. Attys.

*Page & Eells, Stephen M. White,* and *George J. Denis,* for defendants.

Ross, J. The indictment in this case contains 11 counts, the first 4 of which, in effect, charge that on the 9th day of May, 1891, at a certain designated place in this judicial district, near the island of San Clemente, the defendants unlawfully attempted to fit out and arm, fitted out and armed, procured to be fitted out and armed, and were knowingly concerned in furnishing, fitting out, and arming, a certain steamship called the "Itata," which was then and there in the possession and under the control of certain citizens of the republic of Chili, known as the "Congressional Party," and who were then and there, in said republic, organized and banded together in great numbers in armed rebellion and attempted revolution, and carrying on war against the republic of Chili, and the government thereof, with which the United States then and at the time of the finding of the indictment were at peace, with intent that said ship should be employed in the service of the aforesaid Congressional Party, to cruise or commit hostilities against the then established and recognized government of Chili, with which this government then was at peace, contrary to the provisions of section 5283 of the Revised Statutes of the United States, which section is as follows:

"Every person who, within the limits of the United States, fits out and arms, or attempts to fit out and arm, or procures to be fitted out and armed, or knowingly is concerned in the furnishing, fitting out, or arming of, any vessel, with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or com-

mit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, or who issues and delivers a commission within the territory or jurisdiction of the United States, for any vessel, to the intent that she shall be so employed, shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years. .And every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores, which may have been procured for the building or equipment thereof, shall be forfeited, one-half to the use of the informer, and the other half to the use of the United States."

The next three counts of the indictment, in effect, charge that the defendants, at the same time and place, increased, unlawfully procured to be increased, and were knowingly concerned in increasing, the force of a certain ship of war and armed steam-ship called "Itata," which arrived at the port of San Diego in this judicial district on the 2d day of May, 1891, and was at tne time of her said arrival, and to and including the 9th day of May, 1891, (during which time she remained within the jurisdiction of the United States and of this court,) a ship of war in the service of a certain foreign people called the "Congressional Party," then citizens of and residing in the republic of Chili, and who were then and there banded together in large numbers, in open armed rebellion, and attempted forcible revolution, and making war against, and being at war with, a certain foreign state, namely, the republic of Chili, and the lawful government thereof, with which the United States then, and at the finding of the indictment, were at peace, by adding to the force of said armed vessel an equipment solely applicable to war, viz., by adding to her equipment 10,000 rifles, 10,000 bayonets, and 500,000 cartridges therefor, contrary to the provisions of section 5285 of the Revised Statutes of the United States, which is as follows:

"Every person who, within the territory or jurisdiction of the United States, increases or augments, or procures to be increased or augmented, or knowingly is concerned in increasing or augmenting, the force of any ship of war, cruiser, or other armed vessel, which, at the time of her arrival within the United States, was a ship of war, or cruiser, or armed vessel, in the service of any foreign prince or state, or of any colony, district, or people, or belonging to the subjects or citizens of any such prince or state, colony, district, or people, the same being at war with any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, by adding to the number of the guns of such vessel, or by changing those on board of her for guns of a larger caliber, or by adding thereto any equipment solely applicable to war, shall be deemed guilty of a high misdemeanor, and shall be fined not more than one thousand dollars, and imprisoned not more than one year."

The last four counts of the indictment, in effect, charge that the defendants, at the same time and place, began, set on foot, provided the means for, and prepared the means for, a certain military expedition to be carried on from thence against the territory and dominions of a foreign state, namely, the republic of Chili,—the United States then and there, and at the time of the finding of the indictment, being at peace with

said republic,—contrary to the provisions of section 5286 of the Revised Statutes of the United States, which is as follows:

"Every person who, within the territory of the United States, begins or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars, and imprisoned not more than three years."

The evidence introduced by the United States in support of the indictment being concluded, the court is asked by the defendants to direct the jury to return a verdict of not guilty, on the ground that the evidence introduced on the part of the prosecution is insufficient to sustain any count of the indictment. For the purposes of the motion, every fact that the evidence tends to establish must, of course, be considered as proven.

Briefly stated, those facts are as follows: In January of this year the steam-ship Itata was an ordinary merchant vessel. Early in that month she was captured in the harbor of Valparaiso, Chili, by the people designated in this indictment as the "Congressional Party," and who were then engaged in an effort to overthrow the then established and recognized government of Chili, of which Balmaceda was the head. The Itata was by the Congressional Party put in command of one of its officers, and was used in their undertaking as a transport to convey troops, provisions, and munitions of war, and also as an hospital ship, and one in which to confine prisoners. Four small cannon were also put upon her decks, and she carried a jack and pennant. Some time prior to the following April the defendant Trumbull came to the United States as an agent of the Congressional Party, and about the month of April went to the city of New York, and there bought from one of the large mercantile firms of that city, dealing in such matters, 5,000 rifles and 2,000,-000 cartridges therefor, with the intention and for the purpose of sending them to the Congressional Party in Chili for use in their effort to overthrow the Balmacedan government. The sale and purchase of the arms and ammunition were made in the usual course of trade. Trumbull caused them to be shipped by rail to San Francisco, and engaged the defendant Burt to accompany them, which he did. Arrangements had been made by Trumbull with his principals in Chili, by which they were to send a vessel to the United States to get the arms and ammunition, and convey them to Chili for the use of the Congressional Party there. The Itata was dispatched by that party for that purpose, and was accompanied as far as Cape San Lucas by the Esmeralda, a war ship then in the service of the Congressional Party. At one of the Chilian ports the Itata took on board some soldiers, with their arms, by one witness stated to be about 150, and by another to be about 12, in number. At San Lucas the captain of the Esmeralda took command of the Itata, and the captain of the latter was left there in command of the Esmeralda.

The Itata then proceeded to San Diego, really in command of the Esmeralda's captain, but ostensibly in command of another, who represented to the customs officers at that port that she was an ordinary merchantman, and was bound to some port on the northern coast. Before coming into the port of San Diego, or into the waters of the United States, the Itata hauled down her jack and pennant, the cannon theretofore carried on her decks were removed and stowed in her hold, as were also the arms of the soldiers she carried; and their uniforms, as well as those of the officers, were removed, and all appeared in civilian's dress. At that port she laid in stores of coal and provisions, all of which were bought in the open market, and some of which were marked "Esmeralda." Meanwhile Trumbull had chartered a schooner, called the "Robert and Minnie," in San Francisco to take the arms and ammunition from there to a point in this judicial district, then expected to be near the island of Catalina, where she could meet the Itata, and deliver them on board of her to be conveyed to Chili for the purposes already stated. The schooner Robert and Minnie accordingly took on board the arms and ammunition at the port of San Francisco, and, in charge of the defendant Burt, proceeded to the neighborhood of Catalina island, where she expected to meet the Itata. In the mean time the suspicion of some of the officers of the United States that the neutrality laws were being violated was aroused, and the marshal of this district was directed by the attorney general to detain the Itata, if such was found to be the case; and, acting upon those and certain instructions from the district attorney of this judicial district, he went on board the ship at San Diego, and put a keeper in charge of her, and then went in search of the Robert and Minnie, which he did not find in the waters of the United States. Communication was, however, had between the Itata and the schooner, and a point near San Clemente island was fixed upon as the place of meeting for the purpose of transferring the arms and ammunition from the schooner to the ship. Accordingly, the Itata, on the 6th day of May, 1891, without obtaining clearance papers, and against the protest of the person left on board and in charge of her by the marshal, weighed anchor, and steamed out of the harbor of San Diego, with him on board, to meet the Robert and Minnie and receive the arms and ammunition. The marshal's keeper was, however, put ashore at Point Ballast, before leaving the harbor. While steaming out of it, one or more of the Itata's cannon were brought on deck, and some of the soldiers on board of her appeared in uniform. On the 9th of May the Itata and Robert and Minnie came together about a mile and a half southerly of San Clemente island, and there the arms and ammunition in question were taken from the schooner, and put on board the ship in original packages, and the latter at once left with them for Chili.

No evidence was introduced tending to show that the Congressional Party ever received any recognition of any character from the government of the United States until September 4th, when it was recognized as the established and only government of Chili. But since the argu-

ment and submission of the motion the counsel for the United States have called the attention of the court to the following facts furnished by the respective departments, to-wit: On March 4th, the secretary of the navy cabled Admiral McCann "to proceed to Valparaiso, and observe strict neutrality, and take no part in troubles between parties further than to protect American interests." On March 26th, the secretary of the navy cabled Admiral Brown, who had superseded Admiral McCann, "to abstain from proceedings in nature of assistance to either, that is, the Balmaceda or Congressional Party; that the ships of the latter were not to be treated as piratical, so long as they waged war only against the Balmaceda government." On April 25th, Secretary of State Blaine cabled the American minister, "You can act as mediator with Brazilian minister and French *chargé d'affaires.*" On May 5th, Minister Egan cabled this government, "Government of Chili and revolutionists have accepted mediation of the United States, Brazil, and France most cordially; those of England and Germany declined." On May 7th, Acting Secretary of State Wharton acknowledged the dispatch of Minister Egan, and "expressed hope that through combined efforts of the governments in question the strife which has been going on in Chili may be speedily and happily terminated." On May 14th, Acting Secretary of State Wharton cabled Minister Egan that "French minister reports threats to shoot the insurgent envoys by Balmaceda," and directed that they should have ordinary treatment under flag of truce.

The foregoing are the facts of the case as now presented, and the question the court is called upon to decide is whether they are sufficient to justify a verdict against the defendants under any count of the indictment. The counsel for the United States concede that they are insufficient to justify a verdict against the defendants under either of the counts that are based on section 5285 of the Revised Statutes. It seems to me the same thing is equally true in respect to those counts that are based on section 5286. The very terms of that statute imply that the military expeditions or enterprises thereby prohibited are such as originate within the limits of the United States, and are to be carried on from this country. "Every person who, within the limits or jurisdiction of the United States, begins or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence,"—that is to say, from the United States,—is the language of the statute. If the evidence shows that in this case there ever was any military expedition begun or set on foot, or provided or prepared for, within the sense of this statute, it was begun, set on foot, provided and prepared for in Chili, and was to be carried on from Chili, and not from the United States. But I think it perfectly clear that the sending of a ship from Chili to the United States, to take on board arms and ammunition purchased in this country, and carry them back to Chili, is not the beginning, setting on foot, providing or preparing the means for any military expedition or enterprise, within the meaning of section 5286 of the Revised Statutes. The cases of *The Mary A. Hogan,* 18 Fed. Rep. 529; *U. S.* v. *Two Hundred and Fourteen Boxes of Arms, etc.,* 20 Fed. Rep.

50; and *U. S.* v. *Rand*, 17 Fed. Rep. 142,—cited by counsel for the United States in support of their position in respect to this point,—do not at all support it. In each of those cases there was a military expedition, and it was organized within, started from, and was to be carried on from the United States. The facts of those cases are wholly different from the facts of the present case.

There remain for consideration the four counts of the indictment that are based on section 5283 of the Revised Statutes. The first of these, as has been seen, charges that the defendants, on the 9th day of May last, at a certain designated place within this judicial district, unlawfully fitted out and armed a certain steam-ship called the "Itata," which was then and there in the possession and under the control of certain citizens of the republic of Chili, known as the "Congressional Party," and who were then and there, in said republic, organized and banded together in great numbers in armed rebellion and attempted revolution, and carrying on war against the republic of Chili and the government thereof, with which the United States then, and at the time of the finding of the indictment, were at peace, with intent that said ship should be employed in the service of the aforesaid Congressional Party, to cruise or commit hostilities against the then established and recognized government of Chili, with which this government then was at peace. The second count charges that the defendants, at the same time and place, attempted to do the same thing; the third count charges that, at the same time and place, they unlawfully procured the same thing to be done; and the fourth that, at the same time and place, defendants were "unlawfully and knowingly concerned in the furnishing, fitting out, and arming" of the Itata, with intent, etc.

It is contended on behalf of the defendants that section 5283 has no application to this case, for the reason that the people designated in the indictment as the "Congressional Party" do not constitute a people, within the meaning of that section. It is beyond question that the *status* of the people composing the Congressional Party at the time of the commission of the alleged offense is to be regarded by the court as it was then regarded by the political or executive department of the United States. This doctrine is firmly established. *Gelston* v. *Hoyt*, 3 Wheat. 246, 324; *U. S.* v. *Palmer*, Id. 610, 635; *Kennett* v. *Chambers*, 14 How. 38; Whart. Int. Law Dig. pp. 551, 552, and cases there cited. If the dispatches from the secretary of the navy, the secretary of state, and acting secretary of state, already referred to, are to be considered as indicating the light in which the people composing the Congressional Party of Chili were regarded by the executive department of this government prior to their recognition, on the 4th of September, the position of the United States towards them seems to have been similar to that taken by the United States towards the insurgents against Hayti in 1869. That position was thus stated by Mr. Fish, then secretary of state, in a letter dated September 14, 1869:

"(1) That we do not dispute the right of the government of Hayti to treat the officers and crew of the Quaker City and Florida (vessels in the service of

the insurgents against Hayti) as pirates for all intents and purposes. How they are to be regarded by their own legitimate government is a question of municipal law, into which we have no occasion, if we had the right, to enter. (2) That this government is not aware of any reason which would require or justify it in looking upon the vessel named in a different light from any other vessel employed in the service of the insurgents. (3) That, regarding them simply as armed cruisers of the insurgents, not yet acknowledged by this government to have attained belligerent rights, it is competent to the United States to deny and resist the exercise by those vessels, or any other agents of the rebellion, of the privileges which attend maritime war, in respect to our citizens or their property entitled to their protection. We may or may not, at our option, as justice or policy may require, treat them as pirates in the absolute and unqualified sense, or we may, as the circumstances of any actual case shall suggest, waive the extreme right, and recognize, where facts warrant it, an actual intent, on the part of the individual offenders, not to depredate in a criminal sense and for private gain, but to capture and destroy *jure belli.* It is sufficient for the present purpose that the United States will not admit any commission or authority proceeding from rebels as a justification or excuse for injury to persons or property entitled to the protection of this government. They will not tolerate the search or stopping, by cruisers in the rebel service, of vessels of the United States, nor any other act which is only privileged by recognized belligerency. (4) While asserting the right to capture and destroy the vessels in question, and others of similar character, if any aggression upon persons or property entitled to the protection of this government shall recommend such action, we cannot admit the existence of any obligation to do so in the interest of Hayti or of the general security of commerce." 3 Whart. Int. Law Dig. pp. 465, 466.

Does section 5283 of the Revised Statutes apply to any people whom it is optional with the United States to treat as pirates? That section is found in the chapter headed "Neutrality," and it was carried into the Revised Statutes, and was originally enacted in furtherance of the obligations of the nation as a neutral. The very idea of neutrality imports that the neutral will treat each contending party alike; that it will accord no right or privilege to one that it withholds from the other, and will withhold none from one that it accords to the other. In the case of *U. S.* v. *Quincy,* 6 Pet. 445, the supreme court of the United States said that the word "people," in the 3d section of the act of April 20, 1818, (and from that carried into the Revised Statutes as section 5283,) "is one of the denominations applied by the act of congress to a foreign power." This can hardly mean an association of people in no way recognized by the United States, or by the government against which they are rebelling, whose rebellion has not attained the dignity of war, and who may, at the option of the United States, be treated by them as pirates. Prior to the passage of the act of April 20, 1818, the supreme court of the United States, in the case of *Gelston* v. *Hoyt,* 3 Wheat, 246, speaking through Mr. Justice STORY, held that section 3 of the act of 1794, prohibiting the fitting out any ship, etc., for the service of any foreign prince or state, to cruise against the subjects, etc., of any foreign prince or state, with which the United States were at peace, did not apply to any new government, unless it had been recognized by the United States, or by the government of the country to which such new country belonged; and

that a plea which set up a forfeiture under that act, in fitting out a ship to cruise against such new state, must aver such recognition, or it is bad. Congress, in passing the subsequent act of April 20, 1818, by which the provision referred to of the act of 1794 was, in substance, re-enacted, must be presumed to have known the construction that had been theretofore put by the supreme court upon the words "prince or state" in the act of 1794, and with that knowledge, in passing the act of 1818, inserted in the same clause the words "colony, district, or people." This was done, according to Dana's Wheat. Int. Law, § 439, note 215, and Wharton's Int. Law Dig. p. 561, upon the suggestion of the Spanish minister that the South American provinces then in revolt, and not recognized as independent, might not be included in the word "state." But in every one of those instances the United States had acknowledged the existence of a state of war, and, as a consequence, the belligerent rights of the provinces. *The Ambrose Light*, 25 Fed. Rep. 414, and references there made.

It will be observed that the supreme court, in the case of *Gelston* v. *Hoyt*, did not say that the independence of the new government must have been recognized by the United States to make the statute of which it was speaking applicable. There are different kinds or degrees of recognition, but can it be properly said that, in passing an act in furtherance of the obligations of the nation as a neutral, congress was legislating with reference to a people not in any way recognized by the government of the United States, and whom it might, at its option, treat as pirates? "To fall within the statute," said Judge BROWN in the case of *The Carondelet*, 37 Fed. Rep. 800, "the vessel must be intended to be employed in the service of one foreign prince, state, colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of another, with which the United States are 'at peace.' The United States can hardly be said to be 'at peace,' in the sense of the statute, with a faction which they are unwilling to recognize as a government; nor could the cruising or committing of hostilities against such a mere faction well be said to be committing hostilities against the 'subjects, citizens, or property of a district or people,' within the meaning of the statute. So, on the other hand, a vessel, in entering the service of the opposite faction of Hippolyte, could hardly be said to enter the service of a foreign 'prince or state, or of a colony, district, or people,' unless our government had recognized Hippolyte's faction as at least constituting a belligerent, which it does not appear to have done." Attorney General Hoar, however, in a letter to Mr. Fish, secretary of state, of date December 16, 1869, (13 Op. Atty. Gen. U. S. 177,) said:

"Undoubtedly the ordinary application of the statute [in question] is to cases where the United States intends to maintain its neutrality in wars between two other nations, or where both parties to a contest have been recognized as belligerents; that is, as having a sufficiently organized political existence to enable them to carry on war. But the statute is not confined in its terms, nor, as it seems to me, in its scope and proper effect, to such cases. Under it, any persons who are insurgents, or engaged in what would be regarded under our law as levying war against the sovereign power of the na-

tion, though few in number and occupying however small a territory, might procure the fitting out and arming of vessels with intent to commit hostilities against a nation with which we were at peace, and with intent that they should be employed in the service of a ' colony, district, or people' not waging a recognized war."

The attention of Attorney General Hoar does not appear to have been attracted to the decisions of the supreme court and other cases above cited, nor are any authorities cited in support of the views expressed by him. In my opinion, it is, to say the least, extremely doubtful whether section 5283 of the Revised Statutes applies to the present case. But, assuming that it does, the evidence does not sustain the charges based upon it It does not show, or tend to show, that the defendants, or either of them, attempted to do, or procured to be done, or were concerned in doing, anything that they did not in fact do. What the evidence shows that they did do has already been stated. If none of those acts constituted the arming, fitting out, or furnishing the Itata with the intent that she should be employed to cruise or commit hostilities against the then established government of Chili, it necessarily follows that the prosecution has failed to prove the case alleged against the defendants, and the motion made on their behalf should be granted. One of the counsel for the United States conceded, on the argument, that the evidence is insufficient to show that the defendants fitted out and armed the Itata, but he contended strenuously that it is sufficient to show that they were knowingly concerned in "furnishing" her. Of course, if he is right in the concession, it results that the first count is not established by proof; and, since the evidence does not tend to show that the defendants, or either of them, attempted to do, or procured to be done, anything they did not in fact do, the second and third counts would also fall. If, as is thus conceded, and as seems to me to be clear, the putting on board the Itata of the arms and ammunition, under the circumstances and for the purposes stated, did not constitute the fitting out and arming of that vessel, it is difficult to understand how the same acts, committed under the same circumstances and for the same purposes, constituted the "furnishing" of her. There is nothing in the evidence tending to show that any of the arms or ammunition were intended for use by the Itata. On the contrary, the whole case shows that the defendants caused them to be put on board of her with the intention that she should transport them to Chili for the use of the insurrectionary party there. This does not constitute the fitting out, arming, or furnishing of the Itata, with intent that she should be employed to cruise or commit hostilities in the service of the insurrectionary party against the then government of Chili. In principle, the case is, I think, much like that of *The Florida,* decided by Judge BLATCHFORD in 1871, and reported in 4 Ben. 452. That was a suit against the Florida for an alleged forfeiture incurred under the third section of the act of April 20, 1818, now, in substance, section 5283 of the Revised Statutes. The court said:

"Admitting that persons acting as agents of the insurrectionary party in Cuba were the real owners of the vessel and her cargo of arms and muni-

tions of war, and that the transaction of the borrowing, by Darr from Castillo, of the money wherewith the vessel and her cargo were purchased, was a sham, and that the vessel was to proceed with her cargo to Vera Cruz, and there vessel and cargo were to be transferred by Darr, their nominal owner, to persons acting for the insurrectionary party in Cuba, and that thence the vessel was to take the cargo to some point off the coast of Cuba, and land it on the shore by the use of rafts made out of the lumber on board, towed by the steam-launch on board, through shallow water, to the shore, and that Darr and such real owners of the vessel and cargo had an intent to do all this in fitting out the vessel, and putting her cargo on board, still a violation of the third section of the act of 1818 is not thereby made out. A vessel fitted out with intent to do this is not fitted out with intent to cruise or commit hostilities, within the sense of that section. If so, then every vessel fitted out to run a blockade, with a cargo of munitions of war, is necessarily fitted out, within the sense of that section, to commit hostilities against the country whose forces have instituted the blockade. * * * There is no satisfactory evidence that the vessel was furnished or fitted out or armed, or attempted to be furnished or fitted out or armed, with intent that she should be employed to cruise or commit hostilities, in the sense of the third section of the act, in the services of the insurrectionary party in Cuba, against the government of Spain. There is no evidence that she was intended to do anything more than transport her cargo to the coast of Cuba, and cause it to be landed there on rafts, by the aid of the launch on board. To do this was no violation of the third section of the act, which is the one on which the libel is founded."

In a letter from Attorney General Speed to Mr. Seward, then secretary of state, he said:

"I know of no law or regulation which forbids any person or government, whether the political designation be real or assumed, from purchasing arms from the citizens of the United States, and shipping them at the risk of the purchaser." 11 Op. Atty. Gen. U. S. 452.

The fact that secrecy and deception were resorted to in the present case, as was also done in the case of *The Florida*, cannot bring it within the purview of the statute, if not otherwise within it; nor can the circumstance that the Itata, in leaving the port of San Diego in the manner disclosed by the evidence, violated other provisions of law. The case alleged must, of course, be proved; otherwise the defendants are entitled to a verdict of not guilty.

Entertaining the views above expressed, it becomes unnecessary to decide what effect, if any, should otherwise be given in this case to the recognition by the United States, on the 4th of September, of the government established by the Congressional Party, or to determine other questions raised, all of which have been elaborately and very ably argued by counsel.

The evidence introduced on behalf of the prosecution being, in my opinion, insufficient to warrant a conviction under either count of the indictment, the motion made on behalf of the defendants is granted, and the jury are instructed to find a verdict of not guilty.