## UNITED STATES v. HUGHES.

(District Court, E. D. South Carolina. December 9, 1895.)

1. CRIMINAL PROCEDURE — PRELIMINARY EXAMINATION — HEARING BEFORE JUDGE.

When the examination of a person accused of a crime against the United States is held before the district judge, instead of a United States commissioner, the powers of the judge are simply those of a United States commissioner.

2. SAME—POWERS OF UNITED STATES COMMISSIONER.

United States commissioners have no judicial power to hear and determine any matter. Their duties are those of examining magistrates, and, upon the examination of a person accused of crime, they have only to determine whether there is probable cause to believe that an offense was committed by the defendant, and have no authority to pass upon the credibility of testimony, or to find any fact.

3. CRIMINAL LAW—AIDING MILITARY EXPEDITION—PROBABLE CAUSE.

Upon the preliminary examination of one H. for aiding a military expedition in violation of Rev. St. § 5286, there was evidence that the steamship of which H. was captain, after leaving the port of New York and passing outside Sandy Hook, stopped two or three miles from shore; that two tugs approached, and put on board 35 men, with several boxes and three boats; that the boxes were opened, and guns and other arms taken out; that during the voyage the men so taken on board were constantly drilled; that said men spoke Spanish, and some of them said they were going to Cuba to fight; that the steamer approached the coast of Cuba at night, with her lights extinguished; that the men disembarked there, taking their arms with them, and using their own three boats and one lent by the steamer; and that, after their landing, the steamer proceeded on her voyage to Jamaica. Held, that there was probable cause to believe that H. had violated the statute, by providing or preparing the means for a military expedition to be carried on against a foreign state, and he should be held for trial.

4. SAME—PLACE OF TRIAL.

Held, further, that all the acts constituting such offense were committed on the high seas,—the taking on of provisions at New York, in addition to those required for the crew, not constituting an overt act in furtherance of the enterprise, or evidence of intention to commit such an act,—and, accordingly, that H., under Rev. St. § 730, must be tried in the district where he was arrested, and could not be removed thence to the Southern district of New York.

Examination of Samuel Hughes upon a charge of conducting a military expedition in violation of Rev. St. § 5286.

Edward B. Whitney, Asst. Atty. Gen., and W. Perry Murphy, for United States.

S. Mallet Prevost and Buist & Buist, for Spanish government.

M. C. Butler and J. P. K. Bryan, for defendant.

BRAWLEY, District Judge. The American steamship Laurada, owned in Philadelphia, was chartered by Kerr & Co., in September, for two voyages to the West Indies, and sailed during that month for Port Anton, in the Island of Jamaica, with an assorted cargo of merchandise; and, although it appears from the testimony in this case that she had no quarters for passengers, it was in evidence that upon that voyage she carried 86 Italian laborers to work upon a railroad in the Island of Jamaica. Upon her return voyage she

brought a cargo of fruit, and, after discharging the same in the port of New York, she took aboard a cargo of general merchandise, and cleared for the port of Kingston, in Jamaica, sailing on the morning of October 21, 1895. She returned from the second voyage, and after landing a cargo of fruit in New York she came to the port of Charleston. Shortly after reaching this port her master, Samuel Hughes, was arrested upon a warrant and affidavit made by the consul general of Spain before one of the United States commissioners residing in the Southern district of New York, charging him with violating section 5286 of the Revised Statutes of the United States; one of the United States commissioners for this district indorsing said warrant, and, upon his arrest, binding him over for a preliminary investigation to be held on the 6th day of December. Owing to the grave and important nature of the charge, such preliminary investigation, at the request of counsel, was held by me, and upon the hearing two questions have arisen: First, whether there is sufficient cause to commit or bind over the defendant for trial; second, to determine whether the defendant shall be sent to the Southern district of New York to answer the charges.

In determining the first question my powers are simply and only those of a United States commissioner. By the law and practice of the court in this district, the United States commissioners have no judicial power to hear and determine any matter whatsoever. Their duties are those of examining magistrates,—ministerial, not judicial. They are the arms of the court, to execute the preliminary work necessary to bring to trial persons charged with offenses against the United States. They have no authority to determine the probable or improbable credibility of the testimony adduced, nor to find any fact. They can only determine whether there is probable cause to put the defendant on trial. Whenever a charge is made upon oath, and testimony is offered in support of it, and the warrant is approved by the district attorney, the party charged is committed or bound over for trial as a matter of course. In this case the affidavit is in due form, and sufficiently charges the offense; the district attorney has approved the warrant; and testimony has been offered to support the charge. I have simply to determine, not whether an offense has been committed, but whether there is probable cause to believe that an offense was committed. Within these limitations, the testimony will now be considered.

Proof was offered to show that the steamship Laurada sailed from the port of New York about half-past 6 o'clock on the morning of the 21st of October; that, after passing Sandy Hook and discharging the pilot, the steamship stopped at a point variously stated at from two to three miles from the shore; that two tugs approached her, and that 35 men came aboard, bringing with them some boxes and three small boats; that shortly after coming aboard the boxes were opened, and guns, pistols, and machettes were taken out; that the steamship proceeded on her voyage, and on the morning of October 27th land was descried, which proved to be the coast of Cuba; that during the voyage the men were drilled; that they spoke the Spanish language; that some of them stated that they were going to Cuba to fight,—that

they were going to join the Palma regiment; that one Martini was in command; that Cespedes was with the party; that he took no part in the drilling, but was on the bridge with the captain, the defendant, Samuel Hughes; that the drilling took place every day, except two, when the weather was rough; that the light at Cape Maysi, at the east end of the Island of Cuba, was sighted about 7 o'clock on the evening of October 27th; that the Laurada approached near the shore at a point between Guantanamo and Santiago; that the lights upon the steamship were extinguished as they approached the coast; that the men disembarked, carrying with them the boxes, using the three boats that they had brought with them, and one boat belonging to the Laurada; that the point where they landed was apparently uninhabited; that after the landing of these men the Laurada proceeded upon her voyage to Jamaica. It has been strongly urged upon me that this testimony should be disregarded because the three witnesses who gave it are Spanish subjects, and therefore presumed to be hostile to the defendant. This objection does not apply to one of the witnesses, an Italian subject of Austria; but holding as I do that a committing magistrate need not and should not determine the absolute facts in respect to any charge investigated by him, but should determine only whether there is probable cause to believe that an offense has been committed, it remains to be determined whether there is sufficient ground to put the defendant upon trial for violating any laws of the United States. The offense charged is that he has violated section 5286 of the Revised Statutes, which is a portion of what is known as the "Neutrality Act," passed by congress on April 20, 1818, which was a declaration on the part of the government, made during the time of President Monroe, that it was its fixed policy to prevent its territory being used as a basis for hostile military operations against any country or nation with which it was at peace. This section is in the words following:

"Every person who within the territory or jurisdiction of the United States begins or sets on foot, or provides or prepares the means for any military expedition or enterprise to be carried on from thence against the territory or dominion of any foreign province or state, or of any colony, district or people with whom the United States are at peace, shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars and imprisoned not more than three years."

It is further contended that, even if the testimony is taken as true, it does not furnish sufficient proofs that the defendant has violated any law, that the transportation of men or munitions of war is not forbidden by the statute, and that the proof does not show any connection between the defendant and any "military expedition or enterprise." The cases of U. S. v. Trumbull, 48 Fed. 99; U. S. v. Itata, 49 Fed. 647; and other cases growing out of the same transaction,—have been cited in support of this contention. One Trumbull, an agent of the "Congressional party" in Chili, purchased in this country a large quantity of arms and other munitions of war, which were shipped from California for use against the "Balmacedan party," which was recognized by this country at that time as the government of Chili. It was held by Judge Ross, of the South-

ern district of California, that when a party of insurgents, already organized, and carrying on war against the government of a foreign country, send a vessel to procure arms and ammunition in the United States, the act of purchasing such arms and ammunition and placing them on board the vessel is not within the scope of section 5286 of the Revised Statutes. This decision rested upon the ground that the "military enterprise" was begun, provided, and prepared for in Chili, and was to be carried on from Chili, and not from the United States. The case of Hendricks *v.* Gonzalez, 14 C. C. A. 659, 67 Fed. 351, also cited in behalf of the defendant, arose out of the seizure of a merchant vessel whose cargo consisted of arms and munitions, and bound for a port near the seat of hostilities. It was held in that case that such vessel could not be held under section 5290 of the Revised Statutes. The case of The Carondelet, 37 Fed. 800, decided only that the transportation of arms for use by one belligerent in a foreign country against another faction, with which it was at war, was a mere commercial transaction, and not a violation of the neutrality laws. During the Franco-German war, in 1870, about 1,200 Frenchmen embarked at New York in two French steamships, the Lafayette and the Ville de Paris, for the purpose of joining the army of their nation at home. They were not officered nor in any way organized, but the vessel was laden with 96,000 rifles and 11,000,000 cartridges. Mr. Fish, then secretary of state, was of the opinion that the ships could not be looked upon as intended to be used for hostile purposes against Germany; the men not being in an efficient state, and the arms and ammunition being in themselves legitimate commerce. "The uncombined elements of an expedition may leave a neutral state in company with one another, provided they are incapable of proximate combination into an organized whole." It would be different if the men had previously received such military training as would have rendered them fit for closely proximate employment. Hall, Int. Law, p. 609, approved in 2 Eng. St. Papers, p. 128.

It may be considered as the law of this country, settled by repeated decisions of our courts and opinions of the attorney general, that arms and munitions of war are articles of legitimate commerce, and the transportation of them is not forbidden; nor is it a crime, under our neutrality laws, for persons to leave the country with intent to enlist against a foreign power, with which this country is at peace; nor is it unlawful to transport out of this country, with their own consent, persons who intend to so enlist. Giving to the cases relied upon by counsel for the defendant all the weight to which they are properly entitled, they do not tend to the exculpation of the defendant from the charge now under consideration, which in effect is that he aided, furthered, and prepared the means for a "military expedition or enterprise." The statute is very comprehensive in its terms, and any contribution which tends to forward it, or assistance given to those engaged in it, must be considered as within its purview. However legitimate it may have been to have taken aboard his ship either the men or their arms, or both, for transportation to the Island of Cuba, as soon as it became ap-

parent that it was an organized force, capable of proximate combination for offensive purposes, it took on a new character. The uncombined elements engaged in drilling and in the use. of arms, and the enterprise henceforth became essentially a military expedition forbidden by the statute, and by the proclamation of neutrality issued by the president on the 12th of June of this year. If the defendant allowed the deck of his vessel to be used as a parade ground, if he extinguished his lights and approached the coast of Cuba in the nighttime, if he loaned the use of a boat for the purpose of landing those men, it is impossible to resist the conclusion that sufficient cause is shown to require the accused to answer further to the charge exhibited against him. Without in any manner expressing an opinion as to his guilt, I must hold that there is "probable cause" for his commitment, and it will be so ordered.

The second question to be determined is whether the defendant shall be sent for trial to the Southern district of New York. It is strongly urged by the assistant attorney. general, who has appeared with the district attorney, and by the counsel for the Spanish government, that this enterprise had its inception within that district, and that the convenience of witnesses will be promoted by sending the accused there. The constitution provides, in article 3, that "the trial of all crimes against the United States shall be held in the state where the said crime shall have been committed, but when not committed within any state the trial shall be had at such place or places as the congress may by law have directed"; and the congress has directed (section 730 of the Revised Statutes of the United States) that "the trial of an offense committed upon the high seas or elsewhere out of the jurisdiction of any particular state shall be in the district where the offender is found or into which he is first brought." Section 1014 of the Revised Statutes provides for the removal of the accused to the district where the trial is to be had. To constitute the offense of violating section 5286, some overt act must be proved—First, either the beginning or setting on foot a military expedition or enterprise; or, second, the procuring or providing the means for such expedition or enterprise. Under the first head, no proof whatever has been adduced tending to show that the accused began or set on foot this enterprise. His offense, if committed, must fall under the second head,—that of providing or preparing the means for such expedition or enterprise,—and the evidence applicable to this charge must now be considered.

The Southern district of New York is coterminous with the territorial boundary of the southern portion of the state of New York, and includes the city of New York, where, if anywhere within that jurisdiction, the offense must have been committed. No proof whatever has been offered of any criminal act committed while in that city. This statute is a highly criminal and penal one, and it cannot be enlarged by construction beyond the fair import of its terms. Neither arms nor men were taken aboard in the city of New York. The evidence shows, and it was conceded by counsel upon the argument, that the men came aboard after the steamship had passed Sandy Hook, outside the territorial limits of the Southern district of New

York. They may have come from New York, New Jersey, or Connecticut. But it is contended that supplies of provisions and ice were taken aboard the ship in New York, and that this constituted a preparing of the means for the criminal enterprise. There is no proof that the men taken aboard were fed from the ship's stores. They may have carried their own provisions in the boxes which were taken aboard with them. Steerage passengers often do so. But, if it had been proved that supplies for passengers had been taken aboard in New York, that of itself is no offense. No doubt the intention of the defendant, when he left New York, was to stop his vessel somewhere off the Jersey coast, and to take these men aboard, and to land them on the Island of Cuba; but, in view of what has already been said, that of itself was no crime. The transportation of men and arms is no violation of the neutrality laws. Much less is the preparation of means for such transportation. The fact that the men, after they came aboard, organized a military company and began to drill, cannot be legitimately presumed as within his prevision when he prepared for his voyage. It is for this that he is to answer.

The government contends that there is probable cause for charging a continuous crime, commencing in New York, and continuing on the high seas; that the taking of provisions in New York for others besides the crew indicated an intention to commit an unlawful act, and the government having offered proof to show the commission of an unlawful act, the intention will be presumed. The intention with which an act is done is rarely capable of direct proof. It must necessarily in nearly all cases be a matter of inference from some outward manifestation, for the operations of the human mind are secret and invisible. That a man intends the natural consequences of his own act is always to be inferred, but the force of the inference depends upon whether the subsequent visible act clearly and conclusively indicates the particular intention, and is inconsistent with the presumption of any other intention. The law never presumes that a man intends to commit a crime, but the converse. If the taking on of the ship's stores in New York, which is the only outward, visible manifestation of the alleged unlawful intention, is reconcilable with the presumption of innocence, a presumption of guilt cannot be inferred. The provision of such stores of itself indicates nothing more than the usual, customary preparation for a voyage. He could lawfully take on passengers anywhere upon the route. He had done so on his previous voyage. He could carry them to Cuba itself without violating any law. There is no proof that any of such stores were landed in Cuba. The contrary is proved. The facts here clearly distinguish it from the case of U. S. v. Rand, 17 Fed. 142, cited by the counsel for the government. In that case a cargo of arms and other munitions of war were taken aboard in Philadelphia. The men were taken at Inagua, and the ship proceeded to Miragoane, Hayti, where the men were disembarked, an attack was made upon the town, and it was captured. During the attack the vessel stood outside the harbor, and immediately after ran in and landed her stores. In that case the court held that the attack upon and capture of Miragoane was clearly the result of a military enter-

prise, within the terms and spirit of the statute, which began or was set on foot within the territory of the United States. In this case all of the features which give it the character of a military enterprise began upon the high seas. Until the steamship Laurada passed beyond the territorial limits of the Southern district of New York, she had no other character than that of a merchant ship engaged in legitimate commerce. I must hold, therefore, that there is no proof of any "military expedition or enterprise" begun or set on foot within the territory of the United States; but the inhibition of the statute is not confined to cases arising within its territorial limits. It extends to any such unlawful enterprise that may be begun or set on foot, or the means for which are provided or prepared, within its "jurisdiction." Now, the "jurisdiction of the United States" extends to and covers every ship upon which its flag floats, whether such ship sails upon the open, uninclosed waters of the ocean, or lies within the territorial boundaries of another state. Having already held that there is sufficient proof of an offense committed upon the high seas to justify further investigation, the statute (section 730) fixes the place where such trial shall be had. It must be "in the district where the offender is found or into which he is first brought." Inasmuch as the defendant has been arrested within this district, the trial must take place here.

Every government is justly held responsible for the acts of its citizens. The public policy which should control its relations with foreign powers is not a proper subject for judicial inquiry or opinion. So long as it is at peace with foreign nations, it must restrain its citizens from any acts of hostility to a friendly power. Its duties are defined by laws which have their counterpart in the codes of all civilized countries. The strict observance of these obligations and the enforcement of its laws concern the peace and honor of the country.

Let an order be entered to commit the accused, Samuel Hughes, for trial at the approaching January term of the court for the Eastern district of South Carolina. Such order may provide for his being admitted to bail in such amount as may be hereafter determined.