## Case No. 15,731.

### UNITED STATES v. MARTIN.

[2 McLean, 256.][1]

Circuit Court, D. Indiana. Nov. Term, 1840.

OFFENCES AGAINST POSTAL LAWS — CIRCUMSTANTIAL EVIDENCE—NEW TRIAL.

1. An indictment, which charges the defendant with unlawfully abstracting a letter, con-

[1] [Reported by Hon. John McLean, Circuit Justice.]

taining bank notes, from the mail, is good, if it alledges that the letter, containing bank notes, was put into the postoffice to be conveyed by post, and was being conveyed by post, and came into the possession of defendant, as a driver of the mailstage.

[Cited in U. S. v. O'Sullivan, Case No. 15,974; U. S. v. Patterson, Id. 16,011; U. S. v. Jones, 31 Fed. 726.]

2. Circumstantial evidence sufficient to convict. It should, however, be received with caution.

[Cited in U. S. v. Randall, Case No. 16,118.]

3. A new trial will not be granted, unless in the view of the court, injustice has been done.

[Cited in Fearing v. De Wolf, Case No. 4,711; U. S. v. Randall, Id. 16,118.]

[Cited in Levy v. People, 80 N. Y. 337.]

Indictment [against William Martin] for abstracting a letter from the mail, containing bank notes. Motion to quash the indictment, because it does not alledge that the letter was mailed, or regularly put into the United States mail.

Mr. Pettit, U. S. Dist. Atty.
Howard & Judah, for defendant.

HOLMAN, District Judge. The indictment alledges that the letter, containing bank notes, was put into the postoffice to be conveyed by post, and was being conveyed by post, and came into the custody and possession of the defendant, as driver of the mailstage. This allegation is sufficient. The act of congress states that, "if any person employed in any department of the postoffice establishment, shall secrete, embezzle or destroy any letter, mail, or bag of letters, with which he shall be intrusted, or which shall have come to his possession, and are intended to be conveyed by post, containing any bank note," &c. From this language it appears evident that it was the intention of congress to provide for every possible way in which a letter, intended to be conveyed by post, could come into the possession of any person employed in the postoffice establishment. And, therefore, if this letter had come into the hands of the driver of the mailstage, without having been regularly mailed, it was his duty to have conveyed it safely; and he was liable to the penalties of the law if he embezzled it. If the postmaster neglected his duty, in putting the letter into the mailbags, and it came accidentally into the possession of the mailcarrier, and he embezzled it, the case is within the terms of the statute. The indictment is sufficient. Motion overruled.

The defendant was arraigned, and pleaded not guilty, and a jury impannelled and sworn. A number of witnesses were sworn, and gave evidence to the jury. Geo. W. Stewart, on the 5th of May, 1840, wrote a letter to Isaac Stewart, New Albany, in which he inclosed two $100 bills, on the State Bank of Illinois, and put it into the postoffice box in Carlisle, in this state. Robert Aiken testifies to the same facts, being

with G. W. Stewart when the bills were inclosed, and the letter put in the box. Isaac Beecher, postmaster at Carlisle, states that on the said day, about 9 o'clock, he mailed a packet of letters for the distributing office at Vincennes, in which was a letter directed to Isaac Stewart, New Albany, and sent the packet by the mailstage. The defendant was the regular stage driver. When there were extra mails, another driver was sometimes on the route; but there was no extra mail on that day. Vincennes was twenty two miles distant, and the mail reached that place the same day. There was one postoffice between, and another driver on the other part of the line. Mr. Scott, postmaster at Vincennes, states that no packet, nor letters, were received from Carlisle that day. Isaac Stewart testifies that he never received the letter, nor the bank bills. Robert Curry states that defendant was driving on this route in the early part of May; that, on the 8th of May, he was sent by the mail contractor to take defendant's place in driving. As he drove the stage towards Carlisle, defendant went with him. He asked defendant why he gave up the business of driving; and the defendant replied, that he had money enough to do without, and that one was a fool to drive for $15 a month, when he had money enough to do better elsewhere; and, pulling out his pocket book, showed the witness several bank notes, among which, were two for $100 each; but the witness did not know on what bank they were. Defendant further said, he was going to Terre Haute, to settle with Benjamin Reeves, a mail contractor, who owed him money. Benjamin Reeves testified that he never had any business transaction, whatever, with defendant. Mr. Clark states that, being in company with defendant, on the 7th of May he saw the defendant with several bills in his hand—one of them was for $100—but had no opportunity of seeing the character of the others. Stephen Hale, sheriff of Washington county, on the 13th of June, 1840, arrested the defendant, in Salem, on a charge of embezzling this letter. Defendant requested leave to go to a privy, which witness permitted; but witness followed him. and, suddenly opening the door, saw defendant with his pocketbook open, and saw him hastily throw some small bright object into the vault. Took the defendant to the office of a justice of the peace, and went immediately, in company with Doctor Newland (who testifies to the same facts) and others, and, with a candle, reached the vault, and found a bright key in the place where he had seen defendant throw the small object from his pocketbook. Defendant was agitated when he was arrested, but was much more so when Doctor Newland brought in the key, and held it up before him, without saying a word. (This key was found, on trial, to open the mailbags in several postoffices, and several post-masters testified that it was similar to the keys used to open all the waymails.) Mr. Zuel, postmaster on the route from Louisville to Columbus, states that, in July, 1839, the key of his office was lost, and another was sent for from the postmaster at Louisville; that defendant was then driving the mailstage to his office, and knew when the key was sent for; and, once or twice after this, the defendant brought the mail bags to his office unlocked. He inquired of the defendant the reason. The defendant replied, that he had requested the postmaster, at the office next below, to leave them open, as he (Zuel) had lost his key. He never received the key from Louisville.

THE COURT, after summing up the evidence, instructed the jury that they were to determine, on the guilt or innocence of the defendant, from the testimony they had thus heard in the trial; that, before they could find him guilty, they must be satisfied, beyond a reasonable doubt that, on the 5th of May, the defendant was the driver of the mailstage between Carlisle and Vincennes; that the letter containing the bank notes, as charged in the indictment, came into his possession as mailcarrier, and that he secreted, embezzled or destroyed that letter. Any, or all of these allegations, may be proved by circumstances. Circumstances may be sufficiently strong to justify a conviction for any crime; but all circumstantial evidence is to be received with caution. And circumstances, in order to produce conviction, must be established; they must be consistent with each other, and with the guilt of the defendant; and they must, to a moral certainty, exclude the idea of his innocence. The circumstance, that the letter failed to reach its destination, is not sufficient, of itself, to prove that the defendant embezzled it. The circumstance of his having large bank bills, without accounting for how he came by them, is not, by itself, any evidence that he took them from the mail. Nor is the circumstance of his having a mail key, evidence that he ever used it unlawfully. Every circumstance is to be fairly considered, as it bears upon the whole case and conduct, as to prove the allegations in the indictment. That they were to fairly weigh every circumstance, for and against the defendant, and if there was a firm conviction in their minds that he was guilty, as charged in the indictment, it was their duty to say so in their verdict; but if not, they were to find him not guilty.

The jury, after having retired until next day, brought in a verdict of guilty. A motion was made for a new trial, and fully argued.

PER CURIAM. In the argument of this motion it has been suggested, as a reason why a new trial should be granted, that the presiding judge of the court is absent. Be-

fore the commencement of the trial, the absence of the presiding judge was mentioned, and the defendant and his counsel were expressly informed by the court, that if they desired a continuance of the case on that account, it would be granted; but it was their wish to have the trial at this term. The absence of the presiding judge can not, therefore, form the remotest ground for a new trial.

It is also urged, in argument, that the jury left their box, to retire to their room, under improper impressions. It is not pretended that the court instructed the jury improperly, as all the instructions, required by the defendant's counsel, were given in the express terms required; nor were any instructions given to which they excepted. There was no contradictory testimony in the case—no litigated questions of law relative to evidence warmly argued in the hearing of the jury, and but very slight attempts to go beyond the evidence, in the argument to the jury. And, in summing up the evidence, and in the instructions of the court, no undue weight was given to any fact or circumstance that operated against the defendant; nor was any circumstance, however slight, that operated in his favor, omitted; nor is any objection to the substance or manner of the instructions suggested; the court, therefore, think there is not the slightest ground to suppose that the jury retired under erroneous impressions.

The principal ground for a new trial alone remains—that the verdict is contrary to evidence. In reviewing the verdict of a jury regularly given, the verdict must be presumed to be right until the contrary appears; and it should be sustained by the court, if the evidence, by any fair construction, will warrant such a finding. A court is not authorized to set aside a verdict simply because, if they had been on the jury, they would have found a different verdict. It is not sufficient that the verdict may possibly be wrong, but that, after giving a proper weight to all the evidence, it can not be right. This verdict was given on what is called circumstantial evidence, and the court feel disposed to give due weight to the arguments, which have been drawn from reported cases, where innocent individuals have been convicted and punished for supposed crimes, which were never committed, or committed by others. These arguments show the necessity of extreme caution in convicting on circumstantial evidence, but do not prove that circumstances may not be sufficiently strong to authorize a conviction, or, that circumstances are not to be relied on in proof of guilt. If a train of circumstances are not deemed sufficient to produce conviction, the penal laws in relation to many offences, especially most of those against the postoffice regulations, would be a dead letter.

In this case, the court think the circumstances, which were proved, strongly conduced to establish every fact that the jury were required to find, in order to make up their ver-

dict of guilty. The circumstances themselves were established as fully as the nature of the transactions would admit of. As, for instance, without recapitulating the testimony, it was expressly proved that a letter, directed to Isaac Stewart, New Albany, was put into the postoffice box, at Carlisle, on the day named in the indictment, and that the postmaster at Carlisle, on that day, mailed all the letters that were in his office, and going in the direction towards New Albany, in a packet, among which was a letter directed to Isaac Stewart, and that he sent that packet by the mailstage, and that the defendant was the regular driver of the stage. We think this evidence warrants the finding, that this letter came into the possession of the defendant. Nor do we think there are any of the circumstances which are inconsistent with the idea of the defendant's guilt. The two circumstances which were urged, in argument, as being of this character, are perfectly reconcilable with the supposition, that the defendant was guilty, to wit:—his exhibition of the bank bills a few days after the offence was committed, and his continuing, for more than a month, in less than a hundred miles of the place where the offence was committed, and in a section of country where he was not entirely unknown.

Without adverting to the many cases, in the history of human conduct, where persons, guilty of crimes, have acted seemingly contrary to the dictates of common sense, and in such a manner as naturally lead to their detection and punishment, we do not think there is any thing inconsistent with the supposition of the defendant's guilt, in the fact that, a few days afterwards, he exhibited the bills which he is supposed to have embezzled. It cannot be accounted as passing strange that a young stage driver, having recently obtained the possession of what must have appeared to him as a large amount of money, though criminally obtained, when in company with a fellow stage driver younger than himself, and speaking of having plenty of money should, in the flush of self-important feeling likely to arise on such an occasion, exhibit the evidence of his wealth, as the defendant did. It may be termed imprudent —a moment's reflection might show its folly; yet it is by no means improbable. And, if he was in possession of a key that would open any of the waymails, and had been in possession of it for nearly a year, without detection, it is not at all strange that he should continue in a country where he had some acquaintances, and where he might be most likely to be employed in the transportation of the mail, to which, it seems, his attention was directed. A feeling of security might naturally have come over him, and he may have felt it of some consequence to continue in the circle of his former operations, as a stage driver, which, however, was nearly a hundred miles from the place where the crime is said to have been committed. Nor was he

stationary there, as he was said to have been in Louisville seeking an engagement, in the transportation of the mail. Not only are all the circumstances consistent with each other, and with the hypothesis of the defendant's guilt, but, when all taken together, they, to say the least, strongly conduce to exclude the idea of his innocence. Believing, therefore, that the evidence in the case warranted the finding of the jury, the motion for a new trial is overruled.

At a subsequent day of the term, the prisoner was brought before THE COURT, and, having nothing further to alledge why sentence should not be passed upon him, was addressed by THE COURT as follows:

"You have been indicted for the violation of an important trust; and, after a fair trial, in which you have had the aid of able and experienced counsel, you have been found guilty by a jury of your country. And, by a motion for a new trial, zealously and impressively made in your behalf, the court has been required to review the grounds on which this verdict has been given; and, after a careful examination of the facts and circumstances testified against you, are bound to approve of the verdict, and to hold you as guilty, and to pronounce the sentence of the law upon you. It is with no ordinary feelings they discharge this duty. In every view of your case it is painful. To see a young man, under no peculiar disadvantages, just entering into the ranks of men, in a country like ours, where an honest livelihood is every where presented—to see him commence his course in life by the commission of an aggravated crime, and, in one guilty moment, to blast all his future prospects, and incur the penalty of the violated law, whose lightest punishment is ten years' imprisonment in the penitentiary: It is indeed painful. By this fatal deed you have destroyed yourself; you have forfeited your liberty for a long series of years; you have clothed yourself with disgrace, and prostrated all your cherished expectations in life. But, although you have brought yourself into this lamentable condition, your case is not yet desperate. The prospect before you is truly dark and dreary; yet there is a distant ray of hope that may enlighten your path. You are very young, and may have a long life before you. You may do much by a patient submission to the law —by a reformation of life, and an upright line of conduct to enlist the sympathies of your fellow citizens; to reach the clemency of the executive of our government, and, to some extent, to regain a station among honest men. You may do more than this: By repentance and reformation, you may obtain the approbation of Him, whose favor is better than life or liberty, and far more valuable than an earthly reputation. Every thing, therefore, calls upon you, in the most impressive terms, to live every day of your life as an honest, upright man. The court have fixed your pun-

ishment to the shortest period allowed by the law you have violated, and sentence you to a confinement, at hard labor in the penitentiary of this state, for ten years from this time."