## HART v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit.    January 18, 1898.)

### No. 2.

1. NEUTRALITY LAWS—MILITARY EXPEDITION—QUESTIONS FOR JURY.
    Whether the men and munitions of war for which the accused furnished transportation constitute. ` "military expedition," in the meaning of the statute, or the men were tra, ling as individuals, without organization or concert of action, and the arms and munitions were carried as articles of legitimate commerce, and whether the accused had guilty knowledge of the facts constituting the military expedition, if it were such, are questions for the jury, under proper instructions, when from the evidence a conclusion adverse to the accused may rationally be reached.

2. SAME—PROVIDING TRANSPORTATION.
    One who provides the means for transporting a military expedition on any part of its journey, with knowledge of its ultimate destination and unlawful character, is punishable under Rev. St. § 5286.

3. CRIMINAL LAW—INSTRUCTIONS—EXPRESSION OF OPINION ON THE EVIDENCE.
    A federal judge may express his opinion as to the weight and effect of the evidence, if at the same time he clearly informs the jury that they are the sole judges of all questions of fact.

4. SAME—CONDUCT OF TRIAL—ADMISSION OF EVIDENCE.
    The refusal of the trial judge, after the evidence on both sides has been closed, to permit defendant to examine another witness, is a matter of discretion and not reviewable.

5. SAME—SENTENCE TO STATE PENITENTIARY.
    The sentencing of a federal convict to the penitentiary of Pennsylvania, with a provision that he shall be subject in all respects to the same discipline and treatment as state convicts, is not a sentence to hard labor. It adds nothing to the punishment described by the statute, but relates only to prison government and control.
    Acheson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Pennsylvania.

This was an indictment against John D. Hart for alleged violation of the neutrality laws, by furnishing transportation for a military expedition directed against the Spanish government in Cuba. The defendant was convicted in the court below (78 Fed. 868), and thereupon sued out this writ of error.

Wm. W. Ker and George Gray, for plaintiff in error.

James M. Beck (Francis Fisher Kane, on brief), for the United States.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

DALLAS, Circuit Judge. The gravity of this case has been eloquently but needlessly adverted to by counsel on either side. Its

importance both to the public and to the plaintiff in error is obvious, and it has received our most careful attention. The law generally pertinent to it has, however, been so fully considered by the supreme court in Wiborg v. U. S., 163 U. S. 632, 16 Sup. Ct. 1127, 1197, that, for the most part, we have but to apply the principles enunciated in that case to the one now before us. There, as here, the indictment was founded upon section 5286 of the Revised Statutes, which is as follows:

"Every person who, within the territory or jurisdiction of the United States, begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars, and imprisoned not more than three years."

In the Wiborg Case, as in this case, the defendant below was convicted, not of setting on foot, but only of providing the means for, such a military expedition or enterprise as this section denounces; and there, as here, the main questions were as to the sufficiency of the proof—First, of the existence of a military expedition or enterprise, under the statute; and, second, of the defendant's knowledge of the facts by which, if at all, a military expedition or enterprise was made out. In Wiborg's· Case the trial judge had submitted these matters to the jury, and this action, and the instructions which accompanied it, were approved by the supreme court. As to the first question, the court said:

"From that evidence the jury had a right to find that this was a military expedition or enterprise, under the statute, and we think the court properly instructed them on the subject."

And as to the other it used this language:

"We repeat that on the second material question, namely, whether the defendants aided the expedition, with knowledge of the material facts, the jury were instructed that they must acquit unless satisfied beyond reasonable doubt that defendants, when they left Philadelphia, had knowledge of the expedition and its objects, and had arranged and provided for its transportation. We hold that the defendants have no adequate ground of complaint on this branch of the case."

That case and this one were tried by the same learned judge, and it is apparent that he intended to, as it is clear that he did, charge upon the subjects now under consideration to the same effect on both occasions. Therefore the only question now is as to whether the evidence in the present case was so materially different and inadequate as to require its withdrawal from the jury, notwithstanding the prior authoritative decision that the jury's judgment in the previous one had been rightly invoked. If the evidence in this case were believed (and whether or not it should be was left to the jury), there could be no doubt respecting the primary facts, from which the ultimate facts (the existence or nonexistence of a military expedition, and of incriminating knowledge on the part of the defendant) were to be deduced. The court below held that upon both these points it was for the jury to draw the inference which, upon giving the defendant the benefit. of any reasonable doubt, they should be satisfied was the proper one; and the correctness of this ruling depends upon whether or not, as to

each of the questions so submitted, a conclusion adverse to the accused could rationally be reached. If there could not be, we agree that a conviction should not have been permitted, and thus we are brought to consider the evidence. It shows that the defendant was the president and manager of the J. D. Hart Company, and that that company was the owner of the steamship Laurada, which carried the men, weapons, and military supplies, charged to have constituted a military expedition, from a point off Barnegat to the Island of Navassa, where they were transferred to another vessel, the Dauntless, which thereupon took them away in the direction of Cuba. A recital of the more particular facts. so far as they need be recited, is embodied in the charge of the court below, from which we quote:

"Your first inquiry therefore will be, was the expedition which was taken on board the Laurada off Barnegat. and carried to Navassa Island, in sight of Cuba. a military expedition, within the meaning of these terms as I have defined them, set on foot in this country to make war against the government of Cuba? That the destination of the expedition was Cuba does not seem open to reasonable doubt, though this, as well as all other facts in the case, must be decided by you. The people of the Island of Cuba, or a part of them, are engaged in war against their government. Several of the men composing the expedition said, if the evidence is believed (and that, of course, is for you), that Cuba was their destination, and that they were going there to fight the Spanish; and when transferred to the Dauntless, at Navassa, they went in that direction. The men, according to the testimony, were principally Cubans. Was the expedition, however, military, such as I have instructed you the statute contemplates? In other words, had the men combined and organized before leaving this country, and provided themselves with arms, as before described, for the purpose of going to Cuba to make war against the government? They came to the Laurada in a body, apparently acting from a common impulse, as by preconcert. The arms and other military stores came at the same time, though from New York. The men immediately went to work, transferring the arms, ammunition, and other military stores from the schooner on which they came to the Laurada, under the orders of one or more of their number. On the way to Navassa they continued to work about this cargo, opening boxes, assorting ammunition, and making sacks from canvas brought for the purpose, as the witnesses described, under the orders of Capt. Sutro, who, the witnesses say, conferred with and received orders, or appeared to receive orders, from Gen. Roloff. When approaching Navassa, three of the men, wishing, apparently, to desert, if the testimony is believed (and that is a question for you), withdrew from the others, and hid themselves in a part of the ship where they supposed discovery might be avoided, whereupon, as I understand the testimony (and you will judge whether I am right or not), Gen. Roloff had them sought for, brought out, and sent upon the Dauntless, with the other members of the expedition. If this latter statement respecting the desertion of these men, or attempted desertion, hunting them up, bringing them out, and requiring them to go, is true (and you must judge whether it is or not), it shows that the men were not at that time, at all events, free agents, but were subject to orders which they could not disobey. From these circumstances, and from all the evidence bearing on the subject, you must determine whether the men had combined and organized as I have described, in this country, to go to Cuba as a body, and fight, or were going as individuals subject to their own wills, with intent to volunteer in the insurgent service there, if they should see fit to do so on arriving there. You must judge from the evidence whether the men had combined, organized, and consented to the government of one or more of their number here in this country, to go to Cuba and make war there upon the Spanish government, or whether they were going individually, each on his own account, with liberty to volunteer or not, as they saw fit, when they reached Cuba.

"If you do not find that they had so combined and organized before leaving this country, then they did not constitute a military expedition, and the defend-

84 F.—51

ant must be acquitted. If, on the contrary, you find that they had so combined and organized in this country, you must next determine whether the defendant provided means for their transportation, not the whole way, but to Navassa. It is not necessary that he should transport them to Cuba, as I have said. If he provided means for their transportation to Navassa, on their way to Cuba, and made this provision here in Pennsylvania, with knowledge of the character of the expedition and of its destination, he is guilty. The transportation was made by the Laurada. This is an undisputed fact. That somebody here provided her for this service seems clear, though this question, as other questions of fact, I repeat, is for you. It seems to be beyond room for controversy that somebody here provided the Laurada for that service, and provided her with stores and extra boats. I say it appears so to the court, but still you are not bound by what the court thinks of the evidence. The fact is for you. She started from the port of Philadelphia, taking on here, if the witnesses are believed, an unusual supply of coal for her alleged voyage, and an unusual supply of other stores. After clearing for San Antonio, she surrendered this clearance, taking another for a coastwise trip to Wilmington, and upon her arrival there immediately took a clearance for Port Antonio again. After passing down the river 20 miles further, she anchored and awaited the arrival of small boats brought down from Camden, on an order given in Philadelphia. She then proceeded to the breakwater, and out to sea; but, instead of going on a direct course to San Antonio, she turned northward, and went to the point off Barnegat. where she took on the men, arms, ammunition, and other military stores before alluded to. She then proceeded, by the route described, to Navassa, where she transferred the men and other cargo to the Dauntless, together with the boats, or a part of them, taken on down the Delaware. It further appears, as her first officer, Rand, testifies, that her captain pointed out to him on the chart, before leaving Philadelphia, the location off Barnegat, as their next objective point after passing the breakwater. When she got there she took on the cargo, under circumstances which seem to leave no room for doubt that she expected it. Now, gentlemen, you must judge from these circumstances,—from all the testimony relating to the subject,—whether it is not reasonably clear that the Laurada and her supplies, including extra boats, were not provided here, in this district, expressly to carry the expedition subsequently taken on off Barnegat. If they were, you must next determine whether it is proved that the defendant, Hart, made this provision. The vessel was in the service, at the time, as it would seem, of the John D. Hart Company, of which he is president and manager. Who else, or whether anybody else, is in the company, does not appear, so far as I remember. If there is testimony showing that anybody else is in that company, you will remember it. There may be. I remember no such testimony. It is clear, however, according to the testimony, that he was the president of that company, occupied the office, and managed its business. The evidence, if believed (and it is uncontradicted), shows that the defendant gave several orders respecting the vessel about this time, when she came in before this trip, and when she was going out (among these orders was one, if not both, respecting her clearance); that he directed supplies to be put on board; that he took part in employing her crew, and that while the order to overtake her down the Delaware with extra boats was not signed by him, nor anybody else, the tugboat man, Smith, usually employed by the John D. Hart Company, who had taken the Laurada out and turned her down the river that day, to whom this order for extra boats was delivered unsigned, executed it, and presented his bill for this service to Mr. Hart (I believe, the next day, or soon after), and that Mr. Hart tore it up, did not hand it back, saying he knew nothing about the matter. It was, however, paid a day or two later, by the hand of some one whom the witness says was unknown to him. That Mr. Hart knew that the Laurada was going to the point off Barnegat to take the men on board would seem to be clear, if the witnesses are believed; and whether they are to be believed or not is for you, because they testify that he procured the Fox, and sent the men on her to the point where they met the Laurada. If this latter statement is true, the inference seems irresistible that he knew the Laurada was going there for these men. From these circumstances, and from all other evidence, and with a recollection of what counsel have said, you must determine whether the

defendant, here in Philadelphia, provided this vessel and her supplies for the purpose of carrying the expedition to Navassa, on its way to Cuba. If you do not find he did, you will acquit him. If, on the contrary, you find he did, you will pass to the only remaining question in the case. Did he know at the time that the expedition was a military expedition, as charged, when he provided the means for its transportation? To satisfy you he did, the government points to what it calls 'suspicious circumstances' attending the fitting out of the vessel, her clearances, and voyage from this port to the point off Barnegat. What weight these circumstances should have in deciding the question of knowledge on his part is entirely for you. The government argues that the object was to deceive the officers of the United States, which, it says, the defendant could have no object in doing if he did not believe he was violating its laws. On the other side, it is urged for the defendant that it is just as reasonable to believe that the object of these circumstances called suspicious was simply to deceive the Spanish authorities and Spanish agents hereabouts. You must say whether this position of the defendant is a reasonable one or not. The government further points, in this respect, with a view of showing knowledge in the defendant of the character of this expedition, to the fact that the defendant had intimate relations, if the testimony is believed, with the men comprising the expedition; that he forwarded most of them from Atlantic City to the point of embarkation; that he knew who were going,—those with military titles, as those without; that he knew arms and other war material were to be taken on with the men, and must have understood the character of the expedition. If he sent the vessel, the Laurada, to the point off Barnegat, the inference would seem to be entirely reasonable that he understood at that time that she was to take these men, because, if the testimony is believed, he sent the men there,—the principal part of them,—and that he knew that she was to take the military stores, because the vessel took them as if she had previous orders. The vessel was not surprised in finding, so far as appears, that military stores were to be taken. They were taken as matter of course, just as the men were. You have heard and must consider the answer the defendant's counsel have presented to this contention of the government that the defendant, Hart, had knowledge, when the Laurada went out from here, of the character of this expedition; and, from all the evidence bearing on the question, you must determine whether it is proved that the defendant here furnished the means of transportation for the expedition, with knowledge at the time that the expedition was military, as before described. If he did not, he is not guilty. If he did, he is guilty."

That the evidence referred to in this extract is not precisely the same as that from which in Wiborg v. U. S. it was held that providing the means for a military expedition with knowledge of the facts might rightfully be found, is, of course, true; but that it was amply sufficient to warrant its submission to the jury necessarily follows, we think, from the reasoning of the opinion in that case. As is said in Boyd's Wheat. Int. Law, there cited, "the question is one of intent"; and questions of intent and of knowledge, as of other conscious mental conditions, have always been regarded as peculiarly appropriate for solution by a jury. That there were "suspicious circumstances attending the fitting out of the vessel, her clearances, and voyage from this port [Philadelphia] to the point off Barnegat," and that these circumstances were known to the defendant below, is indubitable; but it is contended that as all persons are at liberty to go abroad to enlist in a foreign army, and as the transportation of munitions of war is not prohibited, the court below should have ruled that the evidence adduced was as consistent with a lawful enterprise as with an unlawful one, and upon that ground ought to have directed an acquittal. We cannot assent to this proposition. It begs the question which it was the province of the jury to decide. If it had

appeared that these men were "traveling as individuals, without any concert of action," and that, "as for the arms and ammunition, they were articles of a legitimate commerce," merely, there can be no doubt that a verdict of guilty should have been prevented. But, as we have said, the truth or falsity of the charge of unlawful combination, and of defendant's inculpating knowledge, could be determined only by inference from the facts shown; and the inference which the plaintiff in error insists should have been arbitrarily assumed was surely not a necessary one, and the jury has found it to be not even a reasonable one. We are clearly of opinion that it was not error to allow them to decide whether it was or not. The rule that, to justify conviction of crime, the evidence must be such as to exclude every reasonable hypothesis but that of guilt, has not, it will be observed, been overlooked. But by whom is this rule to be applied? In some cases, no doubt, by the court; but certainly not in such a one as this, where the reasonableness of the only hypothesis of innocence propounded presents at least a question upon which men of ordinary intelligence might honestly differ. The learned judge was therefore right in telling the jury that it was for them to "say whether this position of the defendant was a reasonable one or not," and there is nothing in the evidence which would warrant the supposition that they were mistaken in concluding that it was unreasonable. The same point was made in Wiborg v. U. S.; and there, although the right to transport both contraband goods and individuals intending, but not combined, to engage in war, was distinctly maintained, the court (page 653, 163 U. S., and page 1135, 16 Sup. Ct.), after saying, as might equally well be said in this case, that the district judge had ruled nothing to the contrary, affirmed his action in leaving the questions of combination and of knowledge to the jury, with instructions respecting them which were essentially the same as those which were given in this instance.

We have now expressed our views upon the most important questions which the case presents, and our conclusion is that none of the averments of error which relate to them can be sustained. The others may be briefly disposed of.

It plainly appears on the face of the record that no error to the defendant's disadvantage was committed in overruling the several objections to the district attorney's questions to witnesses which are referred to in the first five errors assigned; and the course pursued by the learned judge (errors 21 and 22) in denying the motion of defendant for leave to examine Henry Lecaste after the evidence on both sides had been closed, and in declining to admit his testimony under the circumstances, is not reviewable here. We may add, however, that we do not doubt that his discretion was justly as well as competently exercised.

We concur in the statement of the court below that it was not necessary that the defendant should have provided the means for carrying the expedition in question to Cuba, but that if he provided the means for any part of its journey, with knowledge of its ultimate destination and of its unlawful character, he was guilty.

The several objections made to the expression by the learned judge of his opinion upon the evidence present no ground for reversal. It

appears that he did, at several points, state his own impressions with distinctness, but it also appears that every disputed fact in the cause was fairly and unreservedly left to the jury.

The twenty-fourth error assigned is not supported by the record. The defendant was not sentenced to "hard labor." He was sentenced to pay a fine, and to be imprisoned in the Eastern Penitentiary of Pennsylvania, with the provision "that he be subject in all respects to the same discipline and treatment as convicts sentenced by the courts of said commonwealth." This proviso adds nothing to the punishment prescribed by the statute. It relates only to prison government and control. Its presence accords, we believe, with the customary practice of the courts of the United States sitting in the state of Pennsylvania; but, if it were absent, the effect of the judgment would necessarily be the same, for the use of the state penitentiaries is allowed to the United States only upon condition that the sentences of the United States courts shall subject their convicts to the same discipline and treatment as those of the state courts. Act Pa. April 15, 1834, § 3 (Purd. Dig. 1660, pl. 9). No error is disclosed by this record, and the judgment of the district court is affirmed.

ACHESON, Circuit Judge (dissenting). I am not able to concur in the views expressed by the majority of the court in this case, and must dissent from the judgment of affirmance. From the very foundation of the government,—both before and since the passage of our neutrality laws,—the right of citizens of the United States to sell to a belligerent, or to carry to a belligerent arms and munitions of war, subject to the opposing belligerent's right of seizure in transitu, and the right of our citizens to transport out of the country, with their own consent, persons who have an intention to enlist in foreign military service, have been firmly and steadily maintained by the executive department, and uniformly upheld by judicial decisions. Mr. Jefferson, secretary of state, to minister of Great Britain, May 15, 1793 (3 Jeff. Works, 558); Mr. Hamilton's treasury circular of August 4, 1793 (1 Am. St. Papers [For. Rel.] 140); 1 Kent, Comm. 142; Richardson v. Insurance Co., 6 Mass. 101, 113; The Santissima Trinidad, 7 Wheat. 283, 340; Mr. Marcy, secretary of state, to Mr. Molina, March 16, 1854 (3 Whart. Int. Law Dig. p. 511); U. S. v. Kazinski, 2 Spr. 7, Fed. Cas. No. 15,508; The Florida, 4 Ben. 452, Fed. Cas. No. 4,887; opinions of Atty. Gen. James Speed, of December 23, 1865, and March 24, 1866 (11 Op. Attys. Gen. 408, 451); Atty. Gen. Akerman to Hamilton Fish, secretary of state, December 4, 1871 (13 Op. Attys. Gen. 541); U. S. v. Trumbull, 48 Fed. 99; The Itata, 49 Fed. 646; Id., 15 U. S. App. 1, 5 C. C. A. 608, and 56 Fed. 505; U. S. v. Pena, 69 Fed. 983; Wiborg v. U. S., 163 U. S. 632, 652, 16 Sup. Ct. 1127, 1197. So pertinent to the facts of the present case is the opinion of Atty. Gen. Akerman, supra, that a portion of it may well here be quoted:

"Assuming the credibility of the sworn statements which he [the Spanish minister] has transmitted, I do not think that they prove against the Hornet any violation of the neutrality laws of the United States. They show that the Hornet conveyed from Aspinwall, to the coast of Cuba, men, arms, and munitions of war, destined to aid the Cuba insurgents. This proof, by itself,

does not bring the vessel within the third section of the neutrality act of April 20, 1818 (3 Stat. 448)."

That this is a sound exposition of our neutrality laws is abundantly shown by the authorities. The Itata, 15 U. S. App. 39, 5 C. C. A. 608, and 56 Fed. 505.

The leading facts of this case, as shown by the record, are these: The defendant, John D. Hart, was the president of the J. D. Hart Company, which owned the steamship Laurada. This vessel was employed to carry to the Island of Navassa a large lot of arms and ammunition which had been purchased in the usual course of trade in the city of New York by a Mr. Eston, but with which purchase the defendant was not connected. The said arms and ammunition were carried in original packages upon a lighter from New York, and placed on board the Laurada off Barnegat, whither the Laurada went after she left the port of Wilmington, Del. At the same time about 18 men, whom the government's witnesses described as Cubans, went in a launch from Atlantic City, and joined the Laurada while she lay off Barnegat. These men assisted in transferring the cargo of arms and ammunition from the lighter to the Laurada, and then went with the Laurada on her voyage. The 18 men came to Atlantic City by railway. They traveled on the same train, and arrived together. They were in citizen's dress, and unarmed. There was evidence tending to show that the defendant had some control over the movements of the Laurada; took part in the shipping of her crew at Philadelphia, and in her sailing orders from that port; and also that he was present at Atlantic City when the 18 men arrived there, and that he participated in providing the launch which took them out to the Laurada. Here the defendant's direct connection with this transaction terminated. It appears, however, that the Laurada proceeded to the Island of Navassa, and was there met by the towboat Dauntless. The cargo of arms and ammunition, still in original packages, was transferred in that form from the Laurada to the Dauntless, which proceeded therewith in the direction of Cuba. To transport the cargo required the Dauntless to make two trips. The men who came on the Laurada from Barnegat put the first load upon the Dauntless, and went off with her. Some of these men returned with the Dauntless to the Laurada, but they did not assist in putting the second load upon the Dauntless. They complained that they were "broken down," and procured the crew of the Laurada to do the second loading. The only thing the men who went on the Laurada from Barnegat are shown to have done in respect to the cargo of arms and ammunition was to perform the services of stevedores. There was no evidence that any of these men had enlisted in the United States for military service in Cuba, or that they had ever been drilled in military tactics, together or singly. There was no evidence whatever that they had formed or were members of any military organization, nor was there any direct evidence that they were acting in a body for any purpose. The one solitary fact tending to show any "preconcert" of action on their part is that they came to Atlantic City in the same railway train, and took passage together upon the launch which carried them to the Laurada, their point of common destination. Certainly the defendant is

not justly chargeable with knowledge of any other inculpating fact. The evidence as to what took place on board the Laurada after she left Barnegat was admissible, as I conceive, only as tending to show that this was a military expedition or enterprise, and not as bearing upon the question of the defendant's knowledge. The substance of this evidence is that the men who were carried by the Laurada opened the large boxes, and took out smaller ones, and stowed them in the hold, on each side of the vessel, under the direction of one of their number; that on one occasion a box of cartridges was opened, and the contents examined by one who was called "General Roloff," and another, who was called "Captain," but the box was then fastened up again; that the men had some canvas, out of which they made small sacks or bags, with a strap to fit one's shoulders; and that several of the men said that "they were going to Cuba to fight,—to fight the Spaniards." There was no evidence that arms were distributed among these men, or that they were drilled, or under military discipline. These 18 men left the Laurada, as they had boarded her, in citizen's dress, and personally unarmed, so far as appears. The first mate, Rand, a witness for the government, testified:

"I never saw an arm, the whole passage out, to my recollection. I did not see the men drilled or uniformed. I did not see them practicing with rifles or with cannons. I became acquainted with Gen. Roloff on board. He was lying down on the quarter deck, nearly the whole passage. I saw large boxes opened, and small boxes taken out. Those boxes had rope handles to them. They were transferred to the Dauntless at Navassa. When the goods were transferred from the Laurada to the Dauntless, they were still in those boxes."

I cannot agree that the case of Wiborg v. U. S., supra, is decisive here. How wide apart the two cases are upon the question of the existence of a "military expedition or enterprise," the following extract from the opinion of Chief Justice Fuller (163 U. S. 654, 16 Sup. Ct. 1136) shows:

"It appears to us that these views of the district judge were correct, as applied to the evidence before him. This body of men went on board a tug, loaded with arms, were taken by it thirty or forty miles, and out to sea; met a steamer outside the three-mile limit, by prior arrangement; boarded her with the arms, opened the boxes, and distributed the arms among themselves; drilled to some extent; were apparently officered; and then, as preconcerted, disembarked, to effect an armed landing on the coast of Cuba."

The distinguishing features of the Wiborg expedition were lacking here. I am of the opinion that the evidence here did not justify a finding that this was a military expedition or enterprise, within the ruling in Wiborg's Case. In origin and purpose, these two enterprises differed essentially, as it appears to me. The adventure on which the Laurada entered was a commercial transaction, neither obnoxious to the law of nations, nor punishable by our municipal law. The Laurada was the carrier of a very large cargo of articles, contraband of war, destined, doubtless, for the use of the Cuban insurgents in their struggle to achieve independence; and on the same voyage she also transported, as she might lawfully do, even with knowledge of their intention to engage in military service abroad, 18 unarmed and ununiformed men, who embark on the vessel, apparently, as mere passengers.

But even if it could be affirmed, in view of after developments, that this was a military expedition, within the prohibition of the statute, still, in my judgment, there was not sufficient evidence upon which to base a finding that the defendant had knowledge that such was the character of the enterprise. In its origin, and while the defendant had any personal connection with it, it was apparently a lawful adventure. It was then incumbent upon the government to furnish some evidence to show that the defendant knew the contrary. Such evidence I do not find. Upon the question of scienter, it must not be overlooked that this defendant's personal connection with the Laurada's voyage ceased at Atlantic City, whereas Wiborg was the master of the Horsa, and was, of course, cognizant of everything that transpired, both when the men boarded her, and during the ensuing voyage. It is said that there were secrecy and mystery in the movements of the Laurada. Be it so. These things in themselves are not criminal, and in this instance do not indicate criminality. They are here consistent with entire innocency. The owners of the Laurada, dealing as carriers with contraband of war, had a perfect right to elude the vigilance of Spanish officials and agents, and avoid a seizure of the cargo on the high seas. It can, I think, confidently be affirmed that all the circumstances relied on to show the defendant's guilt are compatible with his innocence. Now, it is a familiar rule in criminal cases that, to justify a conviction upon circumstantial evidence, the inculpatory facts must be incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt. 1 Greenl. Ev. § 13; Wills, Circ. Ev. 149. In Com. v. McKie, 1 Gray, 61, 62, the supreme court of Massachusetts, in discussing the doctrine of the burden of proof in criminal cases, used language which is apposite to the present case:

"If therefore, the evidence fails to show the act to have been unjustifiable, or leaves that question in doubt, the criminal act is not proved, and the party charged is entitled to an acquittal. * * * In the case supposed, if it is left in doubt on the whole evidence whether the act was the result of accident or design, then the criminal charge is left in doubt. * * * The defendant has a right to say that, upon the proofs so introduced, no case is made against him, because there is left in doubt one of the essential elements of the offense charged, namely, the wrongful, unjustifiable, unlawful intent."

Here, as it seems to me, there was an entire lack of evidence to show guilty knowledge on the part of the defendant. I am not able to discover in this record evidence sufficient to sustain the conviction. I am of opinion that the defendant was entitled to an affirmance of his request for binding instructions in his favor.