## UNION PACIFIC COAL CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.    November 19, 1909.)

### Nos. 3,077–3,081.

**1.** MONOPOLIES (§ 12*) — ANTI-TRUST ACT — TEST OF "UNLAWFUL COMBINA-
TION."

The test of an "unlawful combination" under Act July 2, 1890, c. 647,
§ 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), is its necessary effect upon
free competition in commerce among the states or with foreign nations.

A combination, the necessary effect of which is to stifle, or directly and
substantially to restrict, such competition, is unlawful under that act.

But if the necessary effect of a combination is but incidentally and
indirectly to restrict competition, while its chief result is to foster the
trade and increase the business of those who make and operate it, it
does not fall under the ban of this law.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig.
§ 12.*

For other definitions, see Words and Phrases, vol. 2, pp. 1275, 1276; vol.
8, p. 7606.]

**2.** MONOPOLIES (§ 17*) — ANTI-TRUST ACT — VENDORS NOT FORBIDDEN TO FIX
PRICES AND TERMS OF SALE OF COAL THEREBY.

A coal company engaged in mining and selling its coal is not prohibited
by the anti-trust act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S.
Comp. St. 1901, p. 3200]), or by the law, from refusing to sell its coal,
from selecting its customers, from fixing the price and terms on which it
will sell its product, or from selling to different customers for different
prices and on different terms.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig.
§ 17.*]

**3.** CORPORATIONS (§ 280*) — CRIMES — STOCKHOLDERS — GUILT OF CORPORATION
NOT IMPUTED TO STOCKHOLDER.

A violation of a law by a corporation does not render its nonpar-
ticipating stockholders criminally liable therefor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1186; Dec.
Dig. § 280.*]

**4.** CRIMINAL LAW (§§ 741, 1159*) — SUFFICIENCY OF PROOF — EVIDENCE OF GUILT
MUST EXCLUDE EVERY OTHER HYPOTHESIS — APPEAL.

Unless there is substantial evidence of facts which exclude every other
hypothesis but that of guilt, it is the duty of the trial court to instruct
the jury to return a verdict for the accused.

And where all the substantial evidence is as consistent with innocence
as with guilt, it is the duty of the appellate court to reverse a judgment
of conviction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1713, 1727,
3074–3083; Dec. Dig. §§ 741, 1159.*]

**5.** MONOPOLIES (§ 31*) — EVIDENCE — CONCLUSION.

The Union Pacific Coal Company, Moore, its western sales agent, the
Union Pacific Railroad Company, which owned all the stock of the coal
company, the Oregon Short Line Railroad Company, and Buckingham,
the superintendent of transportation of the railroad companies, were in-
dicted and convicted for combining to restrain interstate commerce by
refusing to sell coal to and to transport coal for one Sharp unless he
would discontinue an advertisement of sale of coal at a reduced rate.

*Held,* there was no substantial evidence of any combination between
any two of the defendants either to refuse to sell coal to Sharp or to re-
fuse to transport it for him.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 31.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
173 F.—47

6. MONOPOLIES (§§ 12, 20*)—COMBINATION BETWEEN CORPORATION AND AGENT —CONSCIOUS PARTICIPATION OF TWO MINDS REQUISITE TO FORM.

A combination between a corporation and its officer or agent in violation of the anti-trust act (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) cannot be formed by the thoughts or acts of the officer or agent alone, without the conscious participation in it of any other officer or agent of the corporation.

The union of two or more persons, the conscious participation of two or more minds, is indispensable to an unlawful combination.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. §§ 12, 20.*]

(Syllabus by the Court.)

In Error to the District Court of the United States for the District of Utah.

The Union Pacific Coal Company, the Union Pacific Railroad Company, the Oregon Short Line Railroad Company, James M. Moore, and Everett Buckingham were convicted of a violation of Act July 2, 1890, and bring error. Reversed and remanded.

C. S. Varian and N. H. Loomis (P. L. Williams, on the brief), for plaintiffs in error.

Hiram E. Booth, U. S. Atty., and William M. McCrea, Asst. U. S. Atty.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

SANBORN, Circuit Judge. This writ of error challenges the legality of the conviction of the Union Pacific Coal Company, a corporation of Wyoming, engaged in mining coal in that state and selling it to retail dealers in Salt Lake City and elsewhere, James M. Moore, its general Western agent, the Union Pacific Railroad Company and the Oregon Short Line Railroad Company, corporations of Utah and common carriers, and Everett Buckingham, general superintendent of the transportation business of these carriers between Green River, in the state of Wyoming, and Salt Lake City, in the state of Utah, of a violation of the act of July 2, 1890, to protect trade and commerce against unlawful restraints and monopolies, commonly called the "Sherman Anti-Trust Act." 26 Stat. 209, c. 647 (U. S. Comp. St. 1901, p. 3200).

The charge in the indictment was that about July 20, 1906, the defendants below combined to force one Sharp, a purchaser of coal from the coal company and a retail dealer therein at Salt Lake City, out of his business, to control and maintain the retail price of coal in that city, and to prevent competition in the sale of coal at retail in Salt Lake City by failing and refusing to sell and to transport to him any of the coal mined by the coal company unless he would discontinue an advertisement he had caused to be inserted in the newspapers to the effect that he would sell storage coal at a reduction of 50 cents a ton from the regular retail price thereof then prevailing in Salt Lake City, and by the refusal of the coal company and Moore to sell to Sharp any

of its coal, and of the railroad companies and Buckingham to transport any coal for him ever after July 22, 1906.

Many specifications of error in the trial are urged upon our consideration; but the most serious is that at its close the court denied the motions of each of the defendants to instruct the jury to return a verdict against the government, because there was no substantial evidence of the alleged combination of any two of the defendants. It may not be unprofitable, before entering upon a review of the evidence challenged by this specification, to call to mind some of the indisputable rules of law by which it must be decided.

The gist of the offense charged in the indictment was not the refusal of the coal company and Moore to sell coal on the purchaser's terms, or of the railroad companies and Buckingham to transport it. It was the combination so to do, and if there was no combination there was no offense. There was no law which forbade the coal company to prescribe the terms on which it would sell its product to Sharp, or to any other purchaser. There was no law which required the coal company to sell its coal to Sharp on the terms which he prescribed, or to sell it to him at all. It had the undoubted right to refuse to sell its coal at any price. It had the right to fix the prices and the terms on which it would sell it, to select its customers, to sell to some and to refuse to sell to others, to sell to some at one price and on one set of terms, and to sell to others at another price and on a different set of terms. There is nothing in the act of July 2, 1890, which deprived the coal company of any of these common rights of the owners and venders of merchandise, and if it did not combine with some other person or persons so to do its refusal to sell its coal to Sharp unless he would withdraw his advertisement of a reduction in his retail price of it was not the violation of the Sherman anti-trust act charged in the indictment. Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. 173, 186, 8 Am. Rep. 159; Whitwell v. Continental Tobacco Co., 125 Fed. 454, 460, 461, 463, 60 C. C. A. 290, 296, 297, 299, 64 L. R. A. 689; 1 Eddy on Combinations, § 292; Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832; In re Greene (C. C.) 52 Fed. 104, 115; In re Grice (C. C.) 79 Fed. 627, 644; Walsh v. Dwight, 40 App. Div. 513, 58 N. Y. Supp. 91, 93; Brown v. Rounsavell, 78 Ill. 589.

A corporation is a person, within the meaning of this act. It is another and different person from any of its stockholders, whether they are corporations or individuals; and no corporation can, by violating a law, make any one of its stockholders who does not himself participate in that violation criminally liable therefor.

The act of July 2, 1890, does not denounce every combination to engage in or to conduct commerce among the states or with foreign nations, but those combinations alone which restrain that commerce. It does not denounce every combination which restrains that commerce, but those combinations only, the necessary effect of which is to stifle, or directly and substantially to restrict, free competition in that commerce. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 330, 339, 340, 17 Sup. Ct. 540, 41 L. Ed. 1007; Addyston Pipe & Steel

Co. v. United States, 175 U. S. 211, 234, 20 Sup. Ct. 96, 44 L. Ed. 136; United States v. Joint Traffic Ass'n, 171 U. S. 505, 576, 577, 19 Sup. Ct. 25, 43 L. Ed. 259; United States v. Northern Securities Company (C. C.) 120 Fed. 721, 722.

If the necessary effect of a combination to engage in or conduct interstate or international commerce is but incidentally and indirectly to restrict competition therein, while its chief result is to foster the trade and to increase the business of those who make and operate it, it does not fall under the ban of this law. Hopkins v. United States, 171 U. S. 573, 592, 19 Sup. Ct. 40, 43 L. Ed. 230; Anderson v. United States, 171 U. S. 604, 616, 19 Sup. Ct. 50, 43 L. Ed. 300; United States v. Joint Traffic Ass'n, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 245, 20 Sup. Ct. 96, 44 L. Ed. 136; Whitwell v. Continental Tobacco Co., 125 Fed. 454, 458, 60 C. C. A. 290, 294, 64 L. R. A. 689, and cases there cited. There are lawful and unlawful combinations of persons conducting interstate and international commerce, and undoubtedly the former vastly outnumber the latter. There is no presumption that two or more persons who have combined to conduct interstate or international commerce are guilty of a combination in restraint of that commerce.

There was a legal presumption that each of the defendants was innocent until he was proved to be guilty beyond a reasonable doubt. The burden was upon the government to make this proof, and evidence of facts that are as consistent with innocence as with guilt is insufficient to sustain a conviction. Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction. Vernon v. United States, 146 Fed. 121, 123, 124, 76 C. C. A. 547, 549, 550; United States v. Richards (D. C.) 149 Fed. 443, 454; Hayes v. United States (C. C. A.) 169 Fed. 101, 103; United States v. Hart (D. C.) 78 Fed. 868, 873, affirmed in Hart v. United States, 84 Fed. 799, 28 C. C. A. 612; United States v. M'Kenzie (D. C.) 35 Fed. 826, 827, 828; United States v. Martin, 26 Fed. Cas. 1183, 1184 (No. 15,731); People v. Ward, 105 Cal. 335, 341, 38 Pac. 945; People v. Murray, 41 Cal. 66, 67; State v. Hunter, 50 Kan. 302, 32 Pac. 37; Bradshaw v. State, 17 Neb. 147, 22 N. W. 361, 366.

We turn to an examination of the evidence in the light of these principles. The defendants naturally divide themselves into two groups, the railroad companies and Buckingham, and the coal company and Moore. There is no evidence that either of the railroad companies or Buckingham ever combined with any one to fail or to refuse, or ever failed or refused, to transport any coal or other merchandise which Sharp offered to any of them for transportation or requested any of them to carry, so that the only question regarding them is whether or not there was substantial evidence that any of them unlawfully combined with the coal company, or with Moore, its Western sales agent, to refuse to sell the product of the coal company to Sharp.

There had been times in winter when the demand for coal in Salt Lake City had been so great that it was impossible for the coal companies and the railroad companies to supply it, and in the summer of 1906, for the purpose of getting as large a portion of the supply for the coming winter into the city in the summer as possible, so that the demand in the winter might not cause a coal famine, as it had done at other times, the coal companies arranged to sell coal which should remain stored with the retail dealers, or with their customers, on August 31, 1906, at a price 25 cents below the regular price for coal sold for general consumption, and the two railroad companies arranged to and did offer a rate of transportation from the mines in Wyoming to Salt Lake City for such stored coal 25 cents lower than the rate on coal sold for general consumption. It had long been, and then was, the practice of the railroad companies bringing coal into Salt Lake City from the mines to collect from the dealers in that city who purchased it both the purchase price of the coal and the freight, to pay over the purchase price to the coal companies which sold it, and to distribute the freight among the carriers that earned it. The reduction on storage coal was to be paid to the purchasers after August 31, 1906, upon proof that the coal remained in store on that day; but the purchasers were charged, and the railroad companies collected in the first instance, the regular price for coal sold for consumption upon all the coal they brought into the city for the coal companies. The reduction in the price was to be refunded after August 31, 1906, upon suitable proof.

The Union Pacific Coal Company had many competitors that were mining coal, selling it, and shipping it to dealers in Salt Lake City, among them four companies which were shipping coal into the city over the Union Pacific Railroad and the Oregon Short Line Railroad. The Union Pacific Railroad Company owned all the stock and a majority of the bonds of the coal company; but Buckingham and the other officers of that company, and of the Short Line Company, at Salt Lake City, bore no official relation to the coal company and they testified that they had no authority over its sales agent, Moore. The general manager of the coal company was one Clark, and his office was at Omaha. He was Moore's superior officer, and he had fixed the coal company's selling price of storage coal by written order. The regular retail price in Salt Lake City was $5.25 per ton, and the retail dealers, including Sharp, had been and were selling all coal at that price, when on July 17, 1906, Sharp published a notice in the newspapers of the city that he would sell coal for storage at $4.75 per ton. Gridley, the manager of another coal company which was shipping coal into the city and selling it, protested to Sharp and to Moore, and notified the latter that his company would reduce the retail price to $4.25 per ton and keep it there all winter unless that advertisement was discontinued. On July 17th Moore asked Sharp to discontinue this advertisement, and told him that the coal company would not sell him any more coal unless he did so. Sharp refused so to do, and on July 18, 1906, Moore stopped shipments of coal to him from the mines of the coal company. On July 20, 1906, Sharp complained to Bancroft, the general manager of the two railroads which brought the coal to the

city, and the latter directed Buckingham, the superintendent of transportation, to investigate the matter. Buckingham called Moore, and talked the matter over with him and Sharp. The latter testified that he told Moore and Buckingham that he had had an understanding with some one other than Moore, who represented him in his absence, to the effect that he might advertise sales of storage coal at $4.75 per ton, and that he would not take the advertisement out;

"that finally Mr. Buckingham asked what I was to do—no, Mr. Moore said— one of his arguments was that Mr. Gridley had threatened this extra 50 cents cut unless I was forced to take it out of the paper, and that they knew he would do it, and would stay with it—he had done it at some other point—and they all agreed that they could not stand anything of that sort, and that I would have to take it out. I refused to do it, and they wanted to know what I would do. I told them I would go out of business first. Q. What did Mr. Buckingham say to you? A. That is what he said to me—asked me; that is one of the things. Q. What else did he say? A. Then he said he was very sorry that I couldn't see it in their light. Q. What did he say about your getting coal in case you did not do as he asked? A. They simply said, if I didn't take the advertisement out of the paper, I wouldn't get coal. Q. Who said that? A. I think Mr. Buckingham. Q. Had Mr. Moore said anything about that before or after? A. In this conversation? Q. Yes. A. Yes, sir; practically the same thing."

He further testified that Buckingham "agreed with Moore that I could not get any more coal"; that he—

"told me I would have to take it out of the paper, and what would I do if I didn't get the coal. I told him I would go out of business first. He, Mr. Buckingham, told me he was awfully sorry that I could not come to their views—not his view; their view."

He testified that he never tried to get any coal after that, that he could not get any coal of the other coal companies, that he sold all the coal he had, and went out of business. He also testified that his understanding was that Moore did as Bancroft told him, that he had had it work that way, that when he could not get coal from Moore he complained to Bancroft and got it, that he thought Bancroft controlled the railroad deliveries, and that Moore had nothing to do with the railroads. And finally he testified in this way:

"Q. Mr. Bancroft is the general manager of the Oregon Short Line Railroad Company, and he has nothing to do with Mr. Moore has he? A. Yes. Q. What? A. What? Nothing official, except, if he asks Mr. Moore to do a thing, I think he will do it. Before he did it."

Moore testified that he stopped the sales to Sharp on July 18, 1906, because the latter would not withdraw his advertisement of the reduced price; that he did this without any understanding or agreement with Bancroft or Buckingham, or any other officer of either of the railroad companies, or any officer of the coal company, or anybody else; that at the meeting on July 20th he and Sharp stated their positions, and then Buckingham said to Sharp:

"I am just coming between you and Mr. Moore. I haven't anything to do with it, but I think you are in the wrong. If I were you I would get in line, and do business as other coal dealers do."

That neither he nor Buckingham told Sharp at that meeting that he could not get any more coal unless he took his advertisement out

of the papers; that he never made any agreement with Buckingham or any one, at or after the meeting of July 20th, not to sell Sharp any more coal; that he heard, but did not know, that the Union Pacific Railroad Company owned and controlled the coal company, but that he did not mean by that that it owned or controlled it in any other way than by the ownership of the stock; that the business of the coal company in selling and shipping coal was entirely distinct from that of the railroad companies; that the railroad companies bought coal of the coal company and paid for it in the same way that they bought coal of other coal companies and paid them for it; that all the business of the coal company, except its sales, was in Wyoming; and that it had its own general manager and superintendent.

Buckingham testified that he had no control of or authority over Moore; that at the meeting of July 20th Sharp and Moore stated their positions, and Moore said Sharp's orders had been held up, and shipments would not be resumed until Sharp's advertisement was discontinued; and that he (Buckingham) told Sharp he could not do anything for him, and that he thought he was standing in his own light. He also testified that he never told Sharp that unless he took the advertisement out of the paper he could get no more coal, that the reason why he could do nothing for Sharp was that it was not a transportation matter and he had no authority, and that he thought it was understood that the Union Pacific Railroad Company controlled the coal company. Bancroft testified that he was the general manager of the Oregon Short Line Railroad Company and of the Union Pacific Railroad Company west of Green river, that he never had any jurisdiction or control of any of the officers of the coal company, that he took it that the Union Pacific Railroad Company controlled the coal company, and that he had no authority over Moore. There was no other evidence material to the issue whether or not the defendants were parties to an unlawful combination not to sell coal to Sharp.

What was there in any of this evidence inconsistent with the absence of such a combination by Buckingham and the railroad companies? The counsel for the government answer: (1) The fact that the storage rate and the reduction in the price of coal and of the freight charges were announced by joint circulars issued by the railroad companies; but this method of announcement was perfectly consistent with the independent action of the coal company, for the railroad companies collected the price of all the coal brought into the city for the coal companies, as well as the freight which the railroad companies earned. (2) The fact that the price of the coal and the freight were collected by the Oregon Short Line Company; but it had been for years, and then was, the custom for the terminal railroad company at Salt Lake City to collect the price of coal delivered for all the vendor companies, and it is hardly probable that all those companies had long been in a combination not to sell coal to Sharp. (3) The fact that both railroad companies were operated by the same set of officials, and that they paid to all dealers the agreed refund on coal held in storage on August 31, 1906; but there is nothing in this fact to indicate that they combined to stop the sale of coal by the coal company to Sharp, for they refunded

to him in the same way as to others. (4) The fact that by Bancroft's direction Buckingham investigated the disagreement between Moore and Sharp two days after the former had stopped selling and shipping coal to Sharp, and the statement of Sharp, which was contradicted by Moore and Buckingham, that the latter told Sharp that unless he took the advertisement out of the newspapers he would not get any more coal, and that he was awfully sorry he could not come to their view; but there is nothing in this investigation, or even in this statement, inconsistent with the theory that Buckingham and Bancroft had no authority to control or direct Moore's action, that Buckingham's investigation was inspired by the interest of the railroad companies in the freight they might earn, and that there was no combination between them and Moore relative to the latter's refusal to sell or ship coal to Sharp. (5) The fact that Sharp had sometimes applied to Bancroft for coal, and had secured it, when he could not get it of Moore; but tnat fact is consistent with the absence of any control over Moore in Bancroft, for the latter testified, and this testimony was not contradicted, that he did not know of a coal dealer in Salt Lake City that he had not caused the railroad companies to purchase coal for and to divert it to, when such dealer was short. (6) The fact that Bancroft, Buckingham, and Moore testified that they understood that the Union Pacific Railroad Company owned and controlled the coal company; but the evidence is undisputed that it owned the stock of the coal company. It did, therefore, own and control it in one sense, and there is no evidence that it owned or controlled it in any other way. There is no substantial evidence that either Bancroft or Buckingham had any authority or control over Moore or his sales, and a stockholder of a corporation does not become criminally liable for a combination made by the corporation without conscious participation therein.

From this review of the evidence and of the argument of the counsel for the government, the fact appears that there was no substantial evidence in this case inconsistent with the innocence of Buckingham and the railroad companies, while there was plenary proof that they were not guilty; for the evidence is conclusive and undisputed that the coal company, through Moore, its agent, refused to sell coal to Sharp and stopped shipments to him two days before Bancroft, or Buckingham, or the railroad companies, knew it. They could not have combined to make that refusal and to prevent the sales of the coal after the refusal had been made and the prevention had been effected, and under the evidence they had no power to change the policy and course of the coal company and to compel it to sell coal to Sharp, save by a vote of its stock by the Union Pacific Company at a succeeding annual election for a board of directors that would pursue such a course. The motion to instruct the jury to return a verdict in favor of Buckingham and the railroad companies should have been granted.

There remain for consideration the coal company and Moore. For the reasons which have been stated, the evidence was insufficient to sustain a conviction of either of them of an unlawful combination with Buckingham or with either of the railroad companies. But counsel for the government argue that the testimony is sufficient to convict them of combining each with the other, and they cite United States v.

MacAndrews & Forbes Co. (C. C.) 119 Fed. 831, 832, in which an indictment of two corporations and their presidents for a combination in violation of the anti-trust act was sustained against the officers, not on the ground that an unlawful combination of either of them with his corporation could be made by his act as an officer of the corporation without the assent or knowledge of any other officer or agent thereof, but on the ground that the corporation might have done some things and the individuals other things which were utterly different, and yet all these things might dovetail together and produce an unlawful combination; People v. Detroit White Lead Works, 82 Mich. 471, 46 N. W. 735, 737, 9 L. R. A. 722, a prosecution for creating and maintaining a nuisance; Overland Cotton Mill Co. v. People, 32 Colo. 263, 269, 75 Pac. 924, 105 Am. St. Rep. 74, a prosecution for employing a child under 12 years of age; United States v. N. Y. Central & H. R. R. Co. (C. C.) 146 Fed. 298, 301, and N. Y. Central R. R. Co. v. United States, 212 U. S. 481, 491, 497, 29 Sup. Ct. 304, 53 L. Ed. 613, a prosecution for giving rebates—cases in which corporations and their officers were convicted, not of any combination, but of violations of specific statutory prohibitions committed by the corporations and the individuals by means of the acts of the latter within the scope of their authority as agents or officers.

But no case has been called to our attention that sustains the position that an agent of a corporation may alone form an unlawful combination between himself and his corporation by his thoughts and acts within the scope of his agency, without the knowledge or participation of any other agent or officer of the corporation. If he may, the distinction between the commission of an offense and a combination to commit it by a corporation vanishes into thin air; for a corporation can act only by an agent, and every time an agent commits an offense within the scope of his authority under this theory the corporation necessarily combines with him to commit it. This cannot be, and it is not, the law. The union of two or more persons, the conscious participation in the scheme of two or more minds, is indispensable to an unlawful combination, and it cannot be created by the action of one man alone. The plan and the act of refusing to sell coal to Sharp unless he would withdraw his advertisement were the scheme and the act of Moore as the agent of the coal company, and of Moore alone. No other agent or officer of the coal company had any knowledge of it, or gave any assent to it, and consequently the scheme and the act failed to evidence an unlawful combination between the corporation and Moore, and the motion to instruct the jury to return a verdict in their favor should have been granted also.

The judgments below must be reversed, and the case must be remanded to the court below, with directions to set aside the verdict and to grant a new trial; and it is so ordered.